STATE OF NORTH CAROLINA v. WAYNE ALAN LAWS

No. 653A85

(Filed 26 July 1989)

1. **Constitutional Law § 66— murder—judge's ex parte communications with jurors—no error**

    A murder defendant's constitutional rights to be present at all stages of his trial were not violated where the trial judge, at the end of the day during jury selection, sent home all those who were still prospective jurors and indicated that he would talk privately with those who had been dismissed from jury service; or where the record indicates that the trial court had routinely inquired about any problems individual jurors might have that the court needed to know about and no such problems were expressed by the jurors or discussed with the court.

    **Am Jur 2d, Criminal Law § 912; Jury §§ 190, 194.**

2. **Criminal Law § 9.3— murder—acting in concert—evidence sufficient**

    The trial court did not err in the guilt-innocence phase of a murder prosecution by instructing the jury that it could find defendant guilty not only for having personally committed the murders but also on the separate theory of acting in con-

STATE v. LAWS

[325 N.C. 81 (1989)]

cert where the uncontroverted evidence tended to show that Texford Watts was in close proximity to the defendant at all pertinent times, from the time they picked up the drunken victims in Watts' car to the time they disposed of evidence after the murders, including evidence tending to incriminate both the defendant and Watts; Watts knew the victims and gave them a ride in his car, driving them to the scene of the murders; physical evidence tended to show that Watts was in very close proximity during the brutal beatings of both victims; Watts picked up the defendant and gave him a ride home after the murders, giving him bloody clothing to dispose of along with the defendant's bloody clothing; and the murder weapon came from the trunk of Watts' car.

**Am Jur 2d, Homicide § 486.**

3. **Homicide § 8.1— murder—voluntary intoxication—evidence not sufficient**

The trial court did not err in a murder prosecution by not instructing the jury during the guilt-innocence phase of the trial on voluntary intoxication where the evidence showed only that defendant drank some unknown quantity of beer over a period of several hours and claimed not to remember the killings. This was not sufficient as a matter of law to meet defendant's burden of producing substantial evidence supporting a conclusion that his mind and reason were so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated intent to kill.

**Am Jur 2d, Homicide §§ 127, 447, 458, 517.**

4. **Homicide § 24.1— murder—burden of proving malice—lapsus linguae**

The trial court's instruction during a murder prosecution that the law *requires* that a killing intentionally inflicted with a deadly weapon is unlawful and done with malice was a mere lapsus linguae and, given the court's subsequent instructions, a juror could not have reasonably interpreted the trial court's charge as relieving the State of its burden of proving malice beyond a reasonable doubt. The lapsus linguae more likely prejudiced the State since the jury was not told that it could, but was not required, to *infer* malice if it found an intentional killing with a deadly weapon.

**Am Jur 2d, Homicide §§ 50, 51, 500.**

STATE v. LAWS

[325 N.C. 81 (1989)]

5. **Criminal Law § 91.1; Constitutional Law § 40— preparation of closing argument—failure to continue trial—no error**

Defendant in a murder prosecution was not denied effective assistance of counsel because the court refused to continue the trial where defendant's counsel, who presented no witnesses, told the court that the prosecution had informed him that the remainder of the State's evidence would take all of Friday; defendant's counsel had put off working on his closing argument until the weekend and was unprepared when the State concluded its case on Friday morning; the court recessed from 12:30 p.m. until 2:00 p.m. and told defendant's counsel to prepare his argument during that time; defense counsel's argument met an objective standard of reasonableness and was within the range of competence demanded of attorneys in capital cases; and defendant pointed to no specific deficiencies in his counsel's closing argument.

**Am Jur 2d, Criminal Law §§ 984 et seq.**

6. **Jury § 7.6— murder—statements by prosecutor during jury selection—no error**

Defendant in a murder prosecution was not entitled to a new trial because of statements the prosecutor made during jury selection which were incomplete statements of the law a jury must apply in a capital sentencing proceeding, but which did not tend to improperly diminish the jurors' responsibility in the process. Furthermore, the trial court gave full and correct instructions with regard to the jury's responsibilities during the sentencing proceeding.

**Am Jur 2d, Homicide § 558; Jury §§ 195 et seq.; New Trial § 162.**

7. **Criminal Law § 102— murder—jury selection—prosecutor's comments**

The prosecutor's comment during jury selection in a murder prosecution that he had a personal belief about the case which should not come in did not amount to a gross impropriety requiring the trial court's intervention.

**Am Jur 2d, Homicide § 558; Jury §§ 195 et seq.; New Trial § 162.**

8. **Criminal Law § 102— murder—jury selection—prosecutor's comments**

The trial court did not abuse its discretion by failing to intervene ex mero motu in a murder prosecution when, during jury selection, the prosecutor pointed out several persons in the courtroom as being members of the victim's family.

**Am Jur 2d, Jury §§ 195 et seq.**

9. **Criminal Law § 102— murder—jury selection—prosecutor's comment**

There was no gross impropriety requiring the trial court to intervene ex mero motu during jury selection in a murder prosecution where defense counsel objected on appeal, but not at trial, to the prosecutor's "speaking objections." Defense counsel's argument that these objections had the effect of ridiculing counsel is tenuous, but assuming that they were improper, their potential for affecting the subsequent trial was de minimis.

**Am Jur 2d, Jury §§ 195 et seq.**

10. **Jury § 6.2— murder—jury selection—prosecutor's question**

There was no gross impropriety requiring intervention ex mero motu in jury selection for a murder trial where the prosecutor repeatedly asked whether jurors could vote for the death penalty if the State satisfied the juror beyond a reasonable doubt that the aggravating circumstances were sufficiently substantial to call for the imposition of the death penalty.

**Am Jur 2d, Jury §§ 195 et seq.**

11. **Criminal Law § 102.6— murder—opening arguments— prosecutor's statements—no error**

There was no prejudicial error in the prosecutor's opening argument in a murder prosecution from the prosecutor's admonishment of the jury that it was their responsibility to uphold the law even though the victims were alcoholics and street people, or from the prosecutor's explanation that some of his expert witnesses were unavailable because they were testifying in a murder case in another county. N.C.G.S. § 15A-1443(a) (1988).

**Am Jur 2d, Trial §§ 202, 204, 293.**

**12. Criminal Law § 128.2— murder—prosecutorial outburst— mistrial denied**

The trial court in a murder prosecution did not err by denying defendant's motion for a mistrial where, at the close of his cross-examination of an accomplice, defense counsel asked the accomplice to admit that he had been charged with the same murders as defendant, asked if the accomplice knew what a liar and a lie were, asked if the accomplice would lie to protect himself, and the prosecutor interjected that he did not want to make an objection but that another judge he named would have defense counsel locked up. Any potential impact was slight and there is no reason to believe that the prosecutor's outburst, while inappropriate, made it impossible for defendant to receive a fair and impartial trial.

**Am Jur 2d, Trial § 193.**

**13. Criminal Law § 102.6— murder—closing argument—reference to victims' families**

The prosecutor's closing argument in a murder prosecution did not include gross improprieties requiring a new trial or a new sentencing proceeding where the prosecutor told the jury to try to do justice for the victims and their families. Unlike the victim impact statement in *Booth v. Maryland*, 482 U.S. 496, this statement did not amount to introducing irrelevant details about the personal characteristics of the victims, the emotional impact of the crimes on the victims' families, and the family members' opinions about the crimes and the defendant.

**Am Jur 2d, Trial §§ 296 et seq.**

**14. Criminal Law § 102.6— murder—prosecutor's closing argument—no error**

There was no error in a murder prosecution where the prosecutor argued to the jury that defendant committed the killings "for the love of killing" where that was a reasonable and permissible inference to be drawn from the evidence.

**Am Jur 2d, Trial § 193.**

**15. Criminal Law § 102.6— murder—prosecutor's closing argument—no error**

There was no error in a murder prosecution from the prosecutor's closing argument regarding defendant's claimed

STATE v. LAWS

[325 N.C. 81 (1989)]

loss of memory because any suggestion in the prosecutor's statement that the jury should not believe the defendant's claimed loss of memory was a reasonable inference to be drawn from the evidence.

**Am Jur 2d, Trial § 193.**

16. **Constitutional Law § 74— murder—closing argument— comment on defendant's loss of memory**
   There was no error in a murder prosecution where the prosecutor noted in his closing argument that defendant claimed that he had no memory of events after a certain point, that he had stopped talking, and that officers had left him alone because the prosecutor was simply summarizing defendant's statement and the manner in which it was terminated. The prosecutor made no mention of any invocation of the Fifth Amendment right to remain silent by defendant and defendant's statement to police that he did not remember anything about events subsequent to picking up the victims and his subsequent silence did not constitute an invocation of his right to remain silent.

**Am Jur 2d, Trial §§ 237 et seq.**

17. **Criminal Law § 102.6— murder—prosecutor's closing argument—no gross impropriety**
   A prosecutor's closing argument in a murder prosecution that nothing could make what had happened any different but that they could make sure that defendant and an accomplice never did that again was not a gross impropriety requiring the trial court to intervene ex mero motu where the prosecutor's argument that the jury should find defendant guilty was supported by evidence and was within the range of a permissible closing argument and the reference to the accomplice, while irrelevant to the trial of defendant, was not prejudicial to the defendant.

**Am Jur 2d, Trial §§ 225, 289.**

18. **Criminal Law § 102.6— murder—closing argument—prosecutor's definition of manslaughter and voluntary intoxication**
   There was no prejudicial error in a murder prosecution from the prosecutor's inadequate explanation of voluntary

manslaughter because the trial court's subsequent correct charge provided adequate correction of any possible confusion, and any error in the prosecutor's statements of the law of voluntary intoxication was favorable to defendant because defendant was not entitled to an instruction on voluntary intoxication.

**Am Jur 2d, Trial § 277.**

**19. Jury § 6.3 — murder — jury selection — belief in literal interpretation of Bible — objection sustained**

There was no abuse of discretion in a murder prosecution where the court sustained the prosecutor's objection to defense counsel asking a juror if she believed in the literal interpretation of the Bible where the trial court allowed defense counsel to inquire into the jurors' religious denominations and the extent of their participation in church activities, allowed defense counsel to ask a juror whether she believed in the Bible, and otherwise gave defense counsel wide latitude to question the jurors about their beliefs, attitudes and biases.

**Am Jur 2d, Jury § 202.**

**20. Criminal Law § 135.9 — murder — sentencing — nonstatutory mitigating factor — denied**

The trial court did not err when sentencing defendant for murder by refusing to submit as a nonstatutory mitigating circumstance that defendant had had a fatherless childhood with no male guidance where, assuming that defendant requested submission of this circumstance and that the request was denied by the trial court, such a finding by the jury would have been based upon speculation and conjecture rather than substantial evidence in the record.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**21. Criminal Law § 135.9 — murder — sentencing — mitigating factor — failure to submit no prior criminal activity**

The trial court did not err when sentencing defendant for murder by failing to submit the statutory mitigating circumstance that defendant has no significant history of prior criminal activity where a jury finding of no significant history of criminal activity, based solely upon defendant's employer's remarks about marijuana use, would have been based purely

STATE v. LAWS

[325 N.C. 81 (1989)]

upon speculation and conjecture and not upon substantial evidence. Moreover, the trial court at defendant's request gave the jury a peremptory instruction to find as a nonstatutory mitigating circumstance that defendant had not been previously convicted of a felony involving violence to the person and, because the evidence before the jury was totally silent on the question, the peremptory instruction was erroneous but favorable to defendant, so that defendant received virtually the same benefit he would have received if the jury had found the statutory mitigating circumstance of no significant history of prior criminal activity and without the State being allowed to introduce his criminal record and other evidence of prior criminal activity. N.C.G.S. § 15A-2000(f)(1).

**Am Jur 2d, Criminal Law §§ 598, 599.**

22. **Criminal Law § 135.9— murder—sentencing—mitigating factor—defendant's age—not submitted**

The trial court did not err when sentencing defendant for murder by not submitting to the jury the statutory mitigating circumstance of defendant's age at the time of the crimes where there was no substantial evidence before the jury concerning this circumstance. N.C.G.S. § 15A-2000(f)(7).

**Am Jur 2d, Criminal Law §§ 598, 599.**

23. **Criminal Law § 135.8— murder—sentencing—aggravating factor—especially heinous, atrocious or cruel**

In a sentencing proceeding for first degree murder, the submission to the jury of the aggravating factor that the murders were especially heinous, atrocious or cruel was justified by the prolonged brutal attacks which were required to inflict the gruesome injuries and to produce the other gruesome evidence in this case. N.C.G.S. § 15A-2000(e)(9).

**Am Jur 2d, Criminal Law §§ 598, 599.**

24. **Criminal Law § 102.12— murder—sentencing—prosecutor's argument**

There was no prejudicial error in a sentencing proceeding for first degree murder from the prosecutor's reading from *State v. Huffstetler*, 312 N.C. 92, to bolster his argument that

the jury should find that these murders were especially heinous, atrocious or cruel where, assuming that the prosecutor's unobjected to reading from *Huffstetler* and argument were so grossly improper as to require the trial court to intervene ex mero motu, the defendant failed to show any resulting prejudice in light of the overwhelming evidence of this aggravating factor produced at trial.

**Am Jur 2d, Trial §§ 272, 279.**

25. **Criminal Law § 102.12 — murder — sentencing — prosecutor's argument — use of decisional law**

There was no error in a sentencing proceeding for first degree murder where the prosecutor argued from *State v. Pinch*, 306 N.C. 1, that the jury could consider the defendant's attack on each victim in aggravation of the murder of the other. A fair interpretation of the prosecutor's reference to the decisional law in context would be that this Court had said that the course of conduct aggravating circumstance exists when the defendant engages in a course of violent criminal conduct against two persons and thereby kills them; that is a fair statement of the law.

**Am Jur 2d, Criminal Law §§ 598, 599.**

26. **Criminal Law § 135.8 — murder — sentencing — aggravating factor — required to be weighed**

By enacting specific aggravating circumstances to be considered in capital sentencing, the Legislature intended that a jury having found one of those statutory circumstances to exist must give it some weight in aggravation when determining the appropriate sentence to recommend; the amount of weight to be given such a statutory aggravating circumstance is left to the determination of the jury. N.C.G.S. § 15A-2000(b), N.C.G.S. § 15A-2000(c).

**Am Jur 2d, Criminal Law §§ 589, 600.**

27. **Criminal Law § 102.12 — murder — sentencing — prosecutor's closing argument**

There was no gross impropriety requiring the trial court to act ex mero motu in the closing argument of the sentencing

proceeding of a first degree murder trial where the prosecutor argued that the victims were entitled to the protection of the law, even though they were just average people suffering sickness and weakness. The argument did not inject highly prejudicial, irrelevant and improper matters such as those contained in the victim impact statements prohibited by *Booth v. Maryland*, 482 U.S. 496.

**Am Jur 2d, Trial §§ 281, 293.**

28. **Criminal Law § 102.12— murder — sentencing — prosecutor's closing argument**

There was no gross impropriety requiring the trial court to intervene ex mero motu in the closing argument of the sentencing proceeding at a murder trial where the prosecutor stated that it was "pathetic" that consideration of the "especially heinous, atrocious or cruel" aggravating circumstance requires the jury to decide that some murders are worse than others. Any effects of such comment were de minimis in light of the fact that the jury was told at all times that it must follow the law and that the law required that first degree murders be especially heinous, atrocious or cruel for this circumstance to exist.

**Am Jur 2d, Trial §§ 225, 289, 317.**

29. **Criminal Law § 102.12— murder — sentencing — prosecutor's closing argument**

There was no gross impropriety requiring the trial court to intervene ex mero motu in the sentencing proceeding of a murder trial based on the prosecutor's alleged misstatement of the law governing the statutory mitigating circumstance of impaired capacity where the jury found the statutory circumstance in mitigation of the crimes despite the prosecutor's comments. N.C.G.S. § 15A-2000(f)(6).

**Am Jur 2d, Trial § 277.**

30. **Criminal Law § 102.12— murder — sentencing — prosecutor's closing argument**

There was no error in the sentencing proceeding of a murder prosecution regarding the prosecutor's argument concerning the "any other circumstance" provisions of N.C.G.S.

§ 15A-2000(f)(9) where the prosecutor's statement, taken in its entirety, would have been reasonably interpreted by the jurors only as an admonition to base their finding and weighing of "any other circumstance" in mitigation upon the evidence and not upon their emotions; furthermore, any possible confusion was corrected by the trial court's instructions.

**Am Jur 2d, Trial §§ 277, 317.**

31. **Criminal Law § 102.12— murder—sentencing—prosecutor's closing argument**

There was no error in the sentencing proceeding of a murder trial where the prosecutor argued that the death penalty was "the only way . . . we are ever going to be sure that this man . . . will never do what he has done again."

**Am Jur 2d, Trial § 289.**

32. **Criminal Law § 102.12— murder—sentencing—prosecutor's closing argument**

There was no gross impropriety requiring the trial court to intervene ex mero motu in the sentencing portion of a murder prosecution where the prosecutor made Biblical references and pointed out that the jury's task was to do what was right by man's law. The prosecutor's references did not amount to a claim that his authority came from God or that to resist his authority was to resist God.

**Am Jur 2d, Trial §§ 283-285.**

33. **Criminal Law § 135.10— murder—death sentence—not arbitrary or disproportionate**

A death sentence for two first degree murders was not recommended or entered under the influence of passion, prejudice, or any arbitrary circumstance, and the sentence of death was not disproportionate where defendant brutally and literally beat the brains out of two heavily intoxicated victims for no apparent reason; he mutilated portions of their skulls while beating them to death with a claw hammer and left them lying on a rural dirt road in pools of blood, hair, flesh, brain matter and pieces of skull; each had been beaten about the head, neck and torso with a hammer and suffered injuries far beyond those required to incapacitate or even kill them;

STATE v. LAWS

[325 N.C. 81 (1989)]

one victim also had six broken ribs; at least one of the victims was already incapacitated and lying motionless on the ground when the savage attacks with the hammer began; the defendant had met the victims a few hours before and apparently had no quarrel with them as they traveled to the isolated area where the brutal killings took place; the jury found the aggravating circumstances that each murder was especially heinous, atrocious or cruel and that each was committed during a course of conduct involving crimes of violence against another person; and the jury found mitigating circumstances that defendant had no prior felonies involving violence against persons, the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the law was impaired, the defendant had been a good and responsible employee, and the defendant had financially assisted his family.

**Am Jur 2d, Criminal Law §§ 599, 609, 628.**

Justice FRYE concurring in the result.

APPEAL of right by the defendant from two judgments sentencing him to death for two convictions of first-degree murder, entered by *Cornelius, J.,* in the Superior Court, DAVIDSON County, on 20 August 1985. Heard in the Supreme Court on 9 May 1989.

*Lacy H. Thornburg, Attorney General, by Doris J. Holton, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Louis D. Bilionis, Assistant Professor of Law, University of North Carolina School of Law, for the defendant.*

MITCHELL, Justice.

The defendant was tried on proper indictments at the 12 August 1985 Special Criminal Session of Superior Court, Davidson County, and was convicted of two counts of murder in the first degree. The jury recommended and the trial court entered a sentence of death for each murder. On appeal the defendant brings forward numerous assignments of error which we address *seriatim*. We conclude that the defendant's trial and sentencing were free of prejudicial error.

STATE v. LAWS

[325 N.C. 81 (1989)]

The State's evidence tended to show that the bodies of Ronnie Waddell, 35, and James Kepley, 57, were found on a rural dirt road in Davidson County on the morning of 19 March 1984. Each had been bludgeoned to death with a hammer which had left telltale wounds about the head and torso. Each had suffered severe lacerations about the head and multiple skull fractures, including large shattered areas of the skull and round "punched out" holes in the skull about an inch in diameter. Pools of blood and pieces of flesh, hair, skull and brain matter were scattered about the bodies. One of the victims had six broken ribs. Autopsies revealed that both victims had died of extensive brain injuries inflicted with a blunt instrument and that both had been heavily intoxicated at the time.

The day after the discovery of the bodies, authorities took Texford Watts into custody and seized a Ford Mustang belonging to Watts and his sister. The defendant Wayne Alan Laws also was taken into custody at about that time. Tire tracks found on the dirt road at the scene of the murders appeared to have been made by tires similar to those on the Mustang. Blood and hair were collected from several areas of the interior and exterior of the vehicle. After taking Watts into custody, authorities also removed several pieces of clothing from a dumpster at the apartment complex where Watts and the defendant lived. Bloodstains, hair, flesh and brain matter were found on the clothing, which included jeans and a shirt belonging to Watts and jeans, a t-shirt, shoes and socks belonging to the defendant Laws.

The victims had relatively rare blood types. Watts' shirt was found to be stained with blood of types consistent with those of both victims. The jeans apparently belonging to Watts were stained with blood consistent with victim Waddell's blood type. The jeans apparently worn by the defendant were stained with blood of types consistent with those of both victims. The t-shirt, shoes and socks identified as the defendant's were stained with blood consistent with the victim Kepley's blood type. Blood found on the Mustang also was consistent with Kepley's blood type.

Hair consistent with that of Waddell was found on Watts' clothing. Hair consistent with that of Kepley was found on the defendant's clothing. Microscopic examination revealed that many of these hairs had been struck repeatedly with a blunt instrument and had been forced from the scalp by blows with a blunt instru-

ment. Fibers collected from the Mustang were consistent with those found on the clothing of the two victims, the defendant and Watts.

At trial, Watts was a witness for the State. Watts testified that he and the defendant lived in the same apartment complex but were not very close friends. They had known each other only a few weeks prior to the murders. Watts testified that on the afternoon of 18 March 1984, he and the defendant drove to Lexington in the Mustang, purchased beer and rode up and down Main Street. After eating dinner in a Lexington restaurant, they headed back to Main Street and were stopped by a police officer who inquired if Watts, who was driving, was drinking. The officer let them go and they went to South Main Street and stopped at a convenience store.

Across the street from the convenience store, the two victims, Waddell and Kepley, were sitting on the curb in front of a restaurant. Watts knew Waddell and recognized Kepley. Watts and the defendant briefly talked with Waddell and Kepley. Waddell tried to sell Watts a tire he had with him and asked Watts for a beer. Watts and the defendant drove away but later saw the victims a little closer to town, still with the tire. Watts and the defendant stopped to talk with the victims, and Waddell asked them to take him somewhere he could get rid of the tire. Waddell and Kepley sat in the back seat of the Mustang, and Waddell began giving Watts directions. It was then dark.

After awhile, they came to a dirt road where there were no houses. Watts stopped the car on the dirt road to get out and relieve himself. Watts testified that after he returned to the car, the defendant Laws got out and asked one of the victims if he also needed to relieve himself. The defendant and both victims left the car, and Watts then heard a noise behind the car which sounded like "licks being passed." When he got out to investigate, Watts saw Kepley lying at the rear of the car, apparently unconscious, and the defendant beating Waddell with his fists a few feet away.

Watts testified that he told the defendant to leave Waddell alone, but the defendant pushed Watts out of the way, got the car keys from the ignition switch, took a claw hammer out of the trunk and began beating Waddell with the hammer. Watts testified that after Waddell fell to the ground, the defendant continued beating him on the head with the hammer. When Watts tried

STATE v. LAWS

[325 N.C. 81 (1989)]

to stop him, the defendant threatened to kill Watts and struck him on the hand with the hammer. After beating Waddell, the defendant started beating Kepley, who was still motionless on the ground, with the hammer. Watts testified that he ran up the road and hid until he heard no more noises. He said he then returned to the Mustang and drove home.

Conflicting statements which Watts had made to police were introduced at trial. He first told police that, after the attack on the victims, he did not see the defendant again until the next day. He later said that while driving home, he saw the defendant on the side of the road and gave him a ride home.

Watts testified at trial that he had given his bloody clothes, later found in the dumpster, to the defendant at the defendant's request. He said that he had started to telephone police about the killings on the night they occurred but had hung up the telephone before the operator connected him with police. He also testified that when he saw the defendant the next day, the defendant threatened to kill him if he told anyone about the killings.

A statement which the defendant Laws had given to police after his arrest was introduced at trial. He more or less confirmed the events described by Watts, up to the time at which they had stopped to talk to Waddell and Kepley in Lexington. The defendant said he remembered stopping and talking with two people whom he did not know, but he could not remember anything after that because he had been drinking.

During the separate sentencing proceeding required by N.C.G.S. § 15A-2000, the trial court submitted and the jury found two aggravating circumstances as to each murder: that the murder was especially heinous, atrocious or cruel, and that the murder was part of a course of conduct which included commission of other crimes of violence against other persons. Five mitigating circumstances were submitted to the jury: that the defendant had not been convicted previously of a felony involving violence to persons, that the defendant had been a good and responsible employee, that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the law was impaired, that the defendant helped to support his family, and any other mitigating circumstances which the jury might find from the evidence. The jury found the four specific circumstances submitted but not "any other" circumstances.

Additional evidence and other matters relevant to the defendant's specific assignments of error are discussed at other points in this opinion.

[1] By his first assignments of error, the defendant contends that his state and federal constitutional rights to be present at all stages of his trial were violated on two occasions when the trial court talked privately with jurors. The first such incident occurred during jury selection when the trial judge, at the end of the day, told some jurors to go home and then told others that he would be coming down to talk to them privately about their jury service. The defendant's contention concerning this incident is without merit, as the transcript shows that the trial judge sent all those who still were prospective jurors home and indicated that he was going to talk only to those whom he had dismissed from jury service. These "jurors" had no role in the defendant's trial.

The second incident occurred at the opening of court on the fifth day of trial. The opening was delayed that morning as the trial court dealt with several matters. When the jurors returned to the courtroom, the judge told the jury:

> We're very pleased to have the jury back again. I apologize to you for the delays. There were several matters that required the Court's attention this morning. It took much longer than we anticipated. I think when I was back earlier that each of you told me you were having no problems this morning.

The defendant, citing *State v. Payne*, 320 N.C. 138, 357 S.E. 2d 612 (1987), argues that this revealed an *ex parte* "communication" between the judge and jury which violated his state and federal constitutional rights to be present during the proceedings against him. The defendant's reliance on *Payne* is misplaced. In that case, the trial judge went into the jury room and, with no one else present, gave certain instructions to the jury after it was impaneled. In the present case, the trial court's reference to the incident complained of appears in the context of a record clearly showing that the trial court had routinely inquired about any problems individual jurors might have that the court needed to know about. Furthermore, the trial court's statement itself indicates that no such problems were either expressed by the jurors or discussed with them by the trial court. We conclude that no *ex parte* "communications" in the sense argued for by the defendant

actually took place, even though they may have been invited by the trial court. These assignments of error are without merit.

We note that the trial judge in this capital case began other days of the trial by asking jurors to raise their hands if they had any problems they needed to talk to the court about and telling them that he would discuss such problems *privately* with them. The record indicates there were no such problems raised, nor any such private conversations held. We would caution against any "private" discussions in similar situations.

[2] By his next assignments of error, the defendant contends that it was reversible "plain error" for the trial court to instruct the jury in the guilt-innocence determination phase of the trial that it could find the defendant guilty of the murders not only for having personally committed them but also on the separate theory that he acted in concert with Texford Watts in committing them. The defendant argues that there was no evidentiary support for the theory that he and Watts acted in concert and, therefore, the jury's verdict may have been based on an erroneous theory. The defendant's argument is without merit.

Under the doctrine of acting in concert, if two or more persons are acting together in pursuit of a common plan or purpose, each of them, if actually or constructively present, is guilty of any crime committed by any of the others in pursuit of the common plan. *State v. Joyner*, 297 N.C. 349, 255 S.E. 2d 390 (1979). To be guilty by reason of acting in concert, it is not necessary for the defendant to do any particular act constituting part of a crime, so long as he is present and acting together with another party or parties, one or more of whom do the acts necessary to constitute the crime pursuant to a common plan or purpose. *Id.* The uncontroverted evidence in this case tended to show that Watts was in close proximity to the defendant at all pertinent times, from the time they picked up the drunken victims in Watts' car to the time they disposed of evidence after the murders, including evidence tending to incriminate both the defendant and Watts. The evidence tended to show that Watts knew the victims and gave them a ride in his car. Watts drove the victims in his car to the scene of the murders. Physical evidence, including blood of the same types as those of both victims, hair and other matter found on his clothing, tended to show that Watts was in very close proximity during the brutal beatings of both victims. The evidence tended to show that

STATE v. LAWS

[325 N.C. 81 (1989)]

Watts picked up the defendant and gave him a ride home after the murders. Watts gave his bloody clothing to the defendant to dispose of along with the defendant's bloody clothing. Further, the murder weapon came from the trunk of Watts' car. The evidence was sufficient to support a reasonable finding that Watts and the defendant had acted in concert in the commission of these murders.

[3] By his next assignment of error, the defendant argues that the trial court, to ensure a just verdict, should have given an instruction in the guilt-innocence determination phase of the trial concerning whether the defendant's voluntary intoxication affected his capacity for premeditated and deliberate murder with specific intent to kill. There was evidence in this case tending to show that the defendant and Watts had drunk an unspecified quantity of beer. In his post-arrest statement, introduced at trial, the defendant said that because of his drinking he did not remember what happened after he and Watts picked up the victims.

Before it is appropriate for the trial court to give a voluntary intoxication instruction, the defendant must produce substantial evidence which would support a conclusion by the trial court that the defendant's mind and reason were so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated intent to kill. *State v. Mash*, 323 N.C. 339, 372 S.E. 2d 532 (1988). We conclude as a matter of law that the evidence in the present case—tending to show only that the defendant drank some unknown quantity of beer over a period of several hours and claimed not to remember the killings—did not meet the defendant's burden of production. *See id.* Therefore, it would have been erroneous for the trial court to give an instruction on voluntary intoxication. *Id.*

[4] By his next assignment of error, the defendant contends that the trial court's instruction on malice relieved the State of its burden of proving malice beyond a reasonable doubt, in violation of the defendant's constitutional rights. The defendant argues that this was prejudicial "plain error" and requires a new trial, notwithstanding his failure to object at trial.

During its charge, the trial court gave the following instruction:

If the State proves beyond a reasonable doubt that the defendant killed the deceased with a deadly weapon or intentionally inflicted a wound upon the deceased with a deadly weapon that

> proximately caused the deceased's death, the law *requires*,
> first, that the killing was unlawful and, second, that it was
> done with malice.

(emphasis added). The defendant contends that the use of the word
"requires" created a mandatory presumption of malice despite evi-
dence suggesting the possibility that the two murders were commit-
ted in a heat of passion. We disagree.

The trial court's use of the word "requires" was merely a
*lapsus linguae* which rendered the instruction ambiguous at worst.
The instruction, standing alone, possibly could be interpreted as
creating a presumption, as argued by the defendant. But it would
more likely be interpreted by lay jurors as creating additional
"requirements" for the State's proof by depriving the State of
any permissible inference of malice from an intentional killing with
a deadly weapon.

The trial court subsequently instructed on heat of passion
and voluntary manslaughter and stated that it was the State's
burden to prove beyond a reasonable doubt that the defendant
did not act in a heat of passion, but instead with malice, and that
failure to prove malice would mean that the defendant was guilty
of no more than voluntary manslaughter. On two subsequent occa-
sions, the trial court also instructed the jury that, even if the
State proved beyond a reasonable doubt that the defendant inten-
tionally struck the victims with the hammer and thereby caused
their deaths, the State still had to prove malice beyond a reasonable
doubt and, absent such proof, it would be the jury's duty to return
verdicts of voluntary manslaughter. Given such instructions, we
conclude that a juror could not reasonably interpret the trial court's
charge as relieving the State of its burden of proving malice beyond
a reasonable doubt. The trial court's *lapsus linguae* more likely
prejudiced the State, since the result was that the jury was not
told that it could, but was not required to, *infer* malice if it found
an intentional killing with a deadly weapon. This assignment is
without merit.

[5]  By his next assignment of error, the defendant contends that
his constitutional rights to effective assistance of counsel were
denied when the trial court refused to continue the trial to give
the defendant's counsel the weekend to prepare a closing argument
for the guilt-innocence determination phase of the trial. The defend-
ant's counsel, who offered no witnesses during this phase, told the

trial court that the prosecutor had informed him that the remainder of the State's evidence would take all of Friday, and that he had put off working on his closing argument until the weekend and was unprepared when the State concluded its case on Friday morning. At 12:30 p.m., the trial court recessed the proceedings until 2:00 p.m. and told the defendant's counsel to prepare his argument during that time. The defendant contends that requiring his counsel to make his closing argument that afternoon denied the defendant effective assistance of counsel.

The test for ineffective assistance of counsel is the same under both the federal and state constitutions. *State v. Braswell*, 312 N.C. 553, 324 S.E. 2d 241 (1985). First, a defendant must show that his counsel's performance fell below an objective standard of reasonableness. *Id.* Second, he must also show that his counsel's deficiencies were so serious as to deprive him of a fair trial. *Id.* The defendant in this case has failed to make either showing.

After examining the transcript of the defense counsel's closing argument, we conclude that it met an objective standard of reasonableness and was within the range of competence demanded of attorneys in capital cases. It was comparable in length to the prosecutor's closing argument and was well organized. The defendant's counsel, who had represented him in the case for almost a year and a half by the time of trial, exhibited good recollection of the critical evidence and vigorously attacked the most serious weaknesses in the State's case and its investigative mistakes. He also vigorously and competently attacked the credibility of Watts, the State's key witness.

The law and evidence in this case were relatively uncomplicated. The State's case consisted almost entirely of Watts' eyewitness testimony, the post-arrest statements given to investigators, and typical expert analysis of a limited amount of physical evidence. The defendant has pointed to no specific deficiencies in his counsel's closing argument, and we detect none.

[6] The defendant next contends that he is entitled to a new trial or, at least, a new sentencing proceeding because of various statements made by the prosecutor during jury selection, which the defendant characterizes as misconduct. No objection was made at trial to any of these statements.

STATE v. LAWS

[325 N.C. 81 (1989)]

The defendant first cites two statements which he contends could tend to diminish the jurors' sense of responsibility. At one point, the prosecutor said:

> If the State satisfies you beyond a reasonable doubt that the aggravating circumstances are sufficiently substantial to call for the death penalty, then by grannies he ought to die for what he's done. That's not because of some personal feeling, that's because the State has proved to you beyond a reasonable doubt that the law says that he should die.

At another point, the prosecutor said:

> If the State satisfied you beyond a reasonable doubt that the aggravating circumstances were sufficiently substantial to call for the imposition of the death penalty, then you wouldn't be responsible for it, the law is responsible for it.

The defendant's contentions that these statements by the prosecutor diminished the jurors' proper sense of responsibility are without merit. Both statements were incomplete statements of the law a jury must apply in a capital sentencing proceeding, because they failed to point out that the jury is to consider all relevant evidence in deciding whether to recommend a sentence of death and also required to weigh the aggravating circumstances it finds against the mitigating circumstances it finds in deciding whether the aggravating circumstances are sufficiently substantial to call for the death penalty. See State v. McKoy, 323 N.C. 1, 372 S.E. 2d 12 (1988) (containing a more complete statement of the jury's responsibility in a capital sentencing proceeding). Both statements, however, reminded the jurors of the State's burden of proof and of their responsibility for weighing the evidence and arriving at findings that would determine the defendant's fate. The additional statements that the law determines the defendant's fate should certain findings be made by the jury did not tend to improperly diminish the jurors' responsibility in the process. Id. (contrasting the types of statements which do tend to diminish the jurors' sense of responsibility, usually by implying that, even if the jury failed to bear its responsibility, the appellate process would save the defendant). This is particularly true in light of the fact that the prosecutor's incomplete statement of the law applicable to capital sentencing procedures came immediately after he had read a correct jury form to them which more fully and accurately explained the law relevant to the jury's function in the sentencing proceeding

in a capital case. Further, before the jury began its consideration of the case, the trial court gave full and correct instructions with regard to the jury's responsibilities during the sentencing proceeding in this defendant's case.

[7]    The defendant next assigns as error the prosecutor's "personal opinion, prejudicial irrelevancies, and obstreperous behavior" which the defendant contends tainted the jury selection process. Defense counsel did not object at trial.

The defendant first complains of a statement by the prosecutor that:

[T]he State must satisfy you beyond a reasonable doubt that this is, quote, "so bad that the man needs to die for it." There's nothing automatic about it. I have a personal belief about that myself, that should not come in here in this case.

The defendant argues that this statement, when taken with an earlier statement by the prosecutor that he was asking the jury to impose the death penalty, amounted to the prosecutor's improper expression of his personal opinion that the death penalty should be imposed. We do not agree.

In a trial for first-degree murder it is the right and duty of the prosecuting attorney to seek the death penalty if there is evidence of aggravating circumstances, and the prosecutor may argue vigorously that it should be imposed. *State v. Johnson*, 298 N.C. 355, 259 S.E. 2d 752 (1979). Furthermore, we have held that when arguments by the prosecutor are not objected to at trial, they must amount to gross impropriety before we will conclude that the trial court abused its discretion by failing to intervene *ex mero motu* to prevent an argument which the defense counsel did not consider objectionable at the time. *Id.* The contested comment here did not amount to gross impropriety requiring the trial court's intervention. *See id.* at 369, 259 S.E. 2d at 761 (prosecutor's sentencing argument that the death penalty should be imposed because this was "one of the worst murder cases I've ever seen" and that the murder was, "if I've ever seen one . . . especially heinous, atrocious and [sic] cruel" was not so grossly improper that intervention by the trial court *ex mero motu* was required).

[8]    The defendant further contends that when the prosecutor pointed out to the jury several persons in the courtroom as being members of one victim's family, he introduced facts not supported

by evidence, improperly aroused the sympathy of the jurors, and violated the defendant's constitutional rights. We find no merit in the defendant's contention that the prosecutor's brief identification of members of one victim's family was unconstitutional under *Booth v. Maryland*, 482 U.S. 496, 96 L.Ed. 2d 440 (1987). In *Booth*, the capital sentencing process was found to be impermissibly tainted by irrelevant and highly prejudicial information contained in a "victim impact statement" used as evidence, which described in detail characteristics of the elderly victims and their family, how the family members reacted to the murders of the elderly couple, and how the murders thereafter changed the lives of the family members. The mere identification of family members present in the courtroom at the opening of the proceedings did not constitute the use of highly prejudicial and irrelevant evidence as prohibited by *Booth*. Certainly, it was not so grossly improper that the trial court abused its discretion by failing to intervene absent any objection.

[9]  The defendant further contends that the prosecutor deliberately and improperly ridiculed defense counsel by raising unnecessary "speaking objections" to several questions posed by defense counsel to jurors during jury selection. He argues that, even though these objections were generally overruled by the trial court, they still had the effect of ridiculing his counsel. As the defense counsel did not contend at trial that any of these speaking objections were improper, they must amount to gross impropriety before we will conclude that the trial court abused its discretion by failing to intervene *ex mero motu. See State v. Johnson*, 298 N.C. 355, 259 S.E. 2d 752 (1979). The defendant's argument that these speaking objections had the effect of ridiculing counsel is tenuous, but assuming *arguendo* that they were improper, they did not rise to the level of gross impropriety and their potential for affecting the subsequent trial was *de minimis*.

[10]  The defendant next contends that during jury selection the prosecutor improperly sought to "hype the case and to stake out and precondition the jurors" by repeatedly asking the following question or variations thereof:

> If the State satisfied you beyond a reasonable doubt . . . that the aggravating circumstances were sufficiently substantial to call for the imposition of the death penalty, then I take it you could give the defendant the death penalty for beating two human beings to death with a hammer, is that correct?

We reject these contentions of the defendant and conclude that such questions by a prosecutor are proper. *See State v. Zuniga*, 320 N.C. 233, 357 S.E. 2d 898, *cert. denied*, --- U.S. ---, 98 L.Ed. 2d 384 (1987). Furthermore, assuming *arguendo* that such questions amounted to error, they did not constitute gross impropriety requiring the trial court to intervene *ex mero motu. Id.*

[11] By his next assignments of error, the defendant contends that prosecutorial misconduct during the guilt-innocence determination phase of his trial requires a new trial or, at least, a new sentencing proceeding, notwithstanding the absence of any objections. The defendant first contends that the prosecutor in his opening statement improperly attempted to arouse sympathy for the victims when he admonished the jurors that even though the evidence would indicate that the victims were "alcoholics" and "street people," it was still the jury's responsibility to uphold the law against their murders. We conclude, however, that the argument was a permissible admonition to the jury to uphold the law, regardless of any prejudices it might have against people such as the victims, and to base its verdict upon the circumstances of the crime and the defendant's culpability. *See South Carolina v. Gathers*, No. 88-305, --- U.S. ---, --- L.Ed. 2d --- (12 June 1989), 49 CCH S.Ct. Bull. p. B2964.

The defendant next contends that the prosecutor was personally vouching for the credibility of his case when he explained to the court and jury that some of his expert witnesses were unavailable when scheduled to testify because they were testifying in a murder case in another county. The trial court sustained an objection but instructed the jury that it could consider that some of the State's witnesses were delayed because of other proceedings. The defendant's suggestion that this amounted to improper buttressing of the State's case is tenuous, at best. The insignificance of the prosecutor's explanation, joined with the trial court's prompt instruction, assured that there was no reasonable possibility that the outcome of the trial was affected. Therefore, any possible error was harmless. N.C.G.S. § 15A-1443(a) (1988).

[12] The defendant next contends that it was error to deny his motion for a mistrial after an injudicious outburst by the prosecutor. At the close of his cross-examination of Texford Watts, the defense counsel caused Watts to admit that he had been charged with the same murders as the defendant and then asked Watts if

he knew what a liar and a lie were and whether he would lie to protect himself. The prosecutor interjected that he did not want to make an objection but that another judge he named would have had the defense counsel "locked up." The trial court cut short the prosecutor by saying "objection sustained." It is not clear from the transcript whether the trial court was sustaining an objection which he thought the prosecutor should have made to the line of questioning or one he thought defense counsel should have made to the prosecutor's outburst, or both. After the prosecutor's brief redirect examination of Watts and a short recess, the defense counsel moved for a mistrial.

Whether a motion for mistrial should be granted is a matter which rests in the sound discretion of the trial court. A mistrial should be granted only when there are improprieties in the trial so serious that they substantially and irreparably prejudice the defendant's case and make it impossible for the defendant to receive a fair and impartial verdict. *State v. Calloway*, 305 N.C. 747, 291 S.E. 2d 622 (1982); N.C.G.S. § 15A-1061 (1988). Ordinarily, denial of a motion for mistrial will not be disturbed on appeal absent a showing of abuse of the trial court's discretion. *State v. Boyd*, 321 N.C. 574, 364 S.E. 2d 118 (1988). We see no reason to believe that the prosecutor's outburst in this case, while inappropriate, made it impossible for the defendant to receive a fair and impartial trial. On the contrary, any potential impact was slight. The defendant has failed to show that the trial court abused its discretion by denying a mistrial.

[13] By his next assignments of error, the defendant contends that the prosecutor's closing argument during the guilt-innocence determination phase included "gross improprieties" which require a new trial or new sentencing proceeding, notwithstanding the defendant's failure to object. The defendant first contends that the prohibitions of *Booth v. Maryland*, 482 U.S. 496, 96 L.Ed. 2d 440 (1987), were violated when the prosecutor told the jury: "The only thing you can do now, right here in this courtroom this week, is to try to do justice in this case for Ronnie Waddell and Mr. Kepley and their families." However, unlike the "victim impact statement" which unconstitutionally tainted the sentencing process in *Booth*, this statement by the prosecutor did not amount to introducing irrelevant details about the personal characteristics of the victims, the emotional impact of the crimes on the victims' families, and the family members' opinions about the crimes and

the defendant. The prosecutor's brief reference to the victims and their families did not entitle the defendant to a new trial or sentencing proceeding. *See State v. Brown,* 320 N.C. 179, 358 S.E. 2d 1, *cert. denied,* --- U.S. ---, 98 L.Ed. 2d 406 (1987) (reference to the rights of the victim's family during the prosecutor's sentencing argument did not violate *Booth*).

The jury's determination of guilt or innocence and recommendation as to sentence must be based on the evidence introduced and not upon any suggested accountability to the victim's family. *State v. Boyd,* 311 N.C. 408, 319 S.E. 2d 189 (1984), *cert. denied,* 471 U.S. 1030, 85 L.Ed. 2d 324 (1985). The prosecutor's statement, in the context in which it was made, did not amount to a grossly improper appeal to the jury's sympathy for the victims and their families. Therefore, the statement did not require the trial court to intervene *ex mero motu.*

[14] The defendant next contends that the prosecutor improperly asserted his personal opinion when he argued to the jury that the defendant committed the killings "for the love of killing." Counsel may argue to the jury the facts in evidence and all reasonable inferences to be drawn therefrom. *State v. Huffstetler,* 312 N.C. 92, 322 S.E. 2d 110 (1984), *cert. denied,* 471 U.S. 1009, 85 L.Ed. 2d 169 (1985); *State v. Pinch,* 306 N.C. 1, 292 S.E. 2d 203, *cert. denied,* 459 U.S. 1056, 74 L.Ed. 2d 622 (1982), *reh. denied,* 459 U.S. 1189, 74 L.Ed. 2d 1031 (1983). That the defendant in this case killed "for the love of killing" was a reasonable and permissible inference to be drawn from the evidence. The State's evidence tended to show that the defendant knew neither victim, that there was no animosity between the defendant and the victims prior to the attacks, that the defendant spontaneously and for no apparent reason decided to kill the victims, that he brutally mutilated and beat holes in the skulls of the victims with a hammer, and that the injuries inflicted upon the victims were far beyond what was necessary to incapacitate or even to kill the victims. *Cf. State v. Zuniga,* 320 N.C. 233, 357 S.E. 2d 898 (1987) (prosecutor's suggestion that the defendant enjoyed killing the victim permissible when evidence tended to show that the defendant stabbed the victim in the neck after raping her).

[15] The defendant's next contentions focus on a portion of the prosecutor's closing argument, which came after the prosecutor had summarized Watts' testimony and reminded the jury that

Watts had admitted to being involved to some extent in the murders. The prosecutor argued:

> What did the defendant say on the other hand? Well, I was out with Watts and we were riding around and we were drinking beer and then we met up with two people, and I sure don't remember anything else. Well, no, he don't want to remember anything else. And he stopped talking and the officers stopped talking to him, as they must do.

The defendant argues that, by making this argument, the prosecutor was improperly calling the defendant a liar. The prosecutor's reference to the defendant's lack of memory stopped short of calling him a "liar" or asserting the prosecutor's personal knowledge that he was lying. Cf. State v. Miller, 271 N.C. 646, 157 S.E. 2d 335 (1967) (counsel may argue to the jury that they should not believe a witness but must stop short of calling him a "liar"). Any suggestion in the prosecutor's statement that the jury should not believe the defendant's claimed loss of memory was a reasonable inference to be drawn from the evidence in light of his detailed account of events up to the point at which he met the victims, his alleged abrupt and total lack of recall after picking up the victims, his behavior subsequent to picking up the victims, and testimony by Watts indicating that the defendant did remember what he had done and later threatened to kill Watts if he told anyone about the killings.

[16] The defendant further argues that his claim that he could not remember anything else to tell authorities during post-arrest questioning was an assertion of his constitutional right to remain silent and that his exercise of that right was improperly used against him when the prosecutor noted that he stopped talking and the officers left him alone. We do not agree.

It is impermissible to suggest that the defendant's guilt can be inferred from his exercise of his Fifth Amendment right to remain silent in the face of accusations. Miranda v. Arizona, 384 U.S. 436, 16 L.Ed. 2d 694 (1966); State v. McCall, 286 N.C. 472, 212 S.E. 2d 132 (1975), appeal after remand, 289 N.C. 512, 223 S.E. 2d 303, vacated in part on other grounds, 429 U.S. 912, 50 L.Ed. 2d 278 (1976). In this case, however, the prosecutor made no mention of any invocation of that right by the defendant. The defendant's statement to police that he did not remember anything about events subsequent to picking up the victims, and his subse-

quent silence, did not constitute an invocation of his right to silence. *See State v. Robbins*, 319 N.C. 465, 356 S.E. 2d 279, *cert. denied*, --- U.S. ---, 98 L.Ed. 2d 226 (1987); *State v. Williams*, 305 N.C. 656, 292 S.E. 2d 243, *cert. denied*, 459 U.S. 1056, 74 L.Ed. 2d 622 (1982). The prosecutor, contrasting Watts' credibility with that of the defendant, was simply summarizing the defendant's statement and the manner in which it terminated.

[17]    The defendant next argues that it was beyond the bounds of fair play for the prosecutor to make the following statements:

> Nothing we can do will make this any different. But what we can do is, we can do justice. We can make sure that Wayne Laws won't ever do this again. We can make sure that Mr. Watts won't ever do this again. And that's my job.

The defendant, who did not object at trial, contends that the statements were the prosecutor's personal opinion and assurances that the defendant did the crime, that Texford Watts did the crime and that the prosecutor would make sure Watts was also punished. The prosecutor's argument that the jury should find the defendant guilty was supported by evidence and within the range of permissible closing argument. The reference to Watts was irrelevant in this trial of the defendant Laws but not prejudicial to the defendant. None of the statements amounted to gross impropriety requiring the trial court to intervene *ex mero motu* and none raised any significant possibility of unfair prejudice affecting the verdict or the jury's sentencing recommendations.

[18]    The defendant next challenges the prosecutor's definition of "voluntary manslaughter." During closing argument, the prosecutor at one point said, "Kind of like, I didn't mean to do it, but, if I did, I'm sorry I did it. That's what voluntary manslaughter is." The prosecutor's explanation of voluntary manslaughter was inadequate but not so grossly improper as to require the trial court to intervene *ex mero motu*. The trial court's subsequent correct charge on the law of voluntary manslaughter provided adequate correction to any possible confusion created by the prosecutor's language.

The defendant also complains that the prosecutor at another point misstated the law of voluntary intoxication as it affects capacity for first-degree murder. As we have concluded that the defendant was not entitled to an instruction on voluntary intoxication, however, any error was favorable to the defendant and harmless.

[19] By his next assignment of error, the defendant contends that he was deprived of his constitutional rights to select a fair and impartial jury when the trial court sustained the prosecutor's objection to the defense counsel's asking a juror if she believed in literal interpretation of the Bible. The trial court has broad discretion in controlling the questioning of prospective jurors, and its decisions will be upheld absent a showing of abuse of discretion. *State v. Lloyd*, 321 N.C. 301, 364 S.E. 2d 316, *vacated and remanded on other grounds*, --- U.S. ---, 102 L.Ed. 2d 18, *reinstated*, 323 N.C. 622, 374 S.E. 2d 277 (1988). Counsel's right to inquire into the beliefs of prospective jurors to determine their biases and attitudes does not extend to all aspects of the jurors' private lives or of their religious beliefs. *Id.* In *Lloyd*, we upheld the trial court's refusal to allow defense counsel to inquire into jurors' religious denominations and the extent of their participation in church activities. The trial court in this case allowed defense counsel to make such inquiries, and even allowed him to ask a juror whether she believed in the Bible. Furthermore, defense counsel was otherwise given wide latitude to question the jurors about their beliefs, attitudes and biases. We conclude that the defendant has shown no abuse of discretion in the trial court's ruling on this one particular question.

[20] We now turn to the defendant's assignments of error concerning his sentencing proceeding. By his first assignment of error, the defendant contends that it was error for the trial court to refuse to submit, as a non-statutory mitigating circumstance, that the defendant "grew up with a fatherless childhood and did not have any male guidance during the time that he was growing up." The only evidence arguably relating to this circumstance came during the sentencing phase from his lone witness, Thomas Hedrick, who was his employer. Hedrick stated that he had never met the defendant's father and, when asked what he knew about the defendant's father, he replied:

> Well, the only thing I know, he skipped out and went to the State of Washington when they was all small, and left them in the mountains to live off of welfare, up around Canton . . . .

The trial court must submit a requested non-statutory mitigating circumstance if a jury could reasonably find it to have mitigating value and there is substantial evidence to support a reasonable finding by the jury that the circumstance exists. *State v. Benson*,

323 N.C. 318, 372 S.E. 2d 517 (1988). However, the defendant must make a timely request that such non-statutory mitigating circumstances be specifically included on the written sentencing form and specifically included in the jury instructions; otherwise, such circumstances will be deemed to receive proper consideration under the "any other circumstance" provision of N.C.G.S. § 15A-2000(f)(9). *State v. Johnson*, 298 N.C. 47, 257 S.E. 2d 597 (1979).

Although it is not clear from the transcript, it appears the defense counsel requested that this non-statutory mitigating circumstance be submitted. Assuming *arguendo* that the defendant requested submission of this non-statutory mitigating circumstance and that such request was denied by the trial court, we conclude that the trial court did not err. The witness Hedrick only testified that the defendant's father left the family when all the children were small. He did not indicate exactly when that occurred or the age of the defendant at the time. No evidence tended to show that the defendant thereafter had no contact with his father or that there were no other male role models who gave the defendant guidance during his childhood. In fact, Hedrick testified that the defendant had an older brother. Hedrick's lone statement that the defendant's father had "skipped out on" his family at some point was insufficient to support a reasonable finding by the jury that the defendant had a fatherless childhood with no male guidance. Such a finding by the jury would have been based upon speculation and conjecture, not upon substantial evidence in the record.

[21] By his next assignment of error, the defendant contends that he is entitled to a new sentencing proceeding because the trial court did not submit the statutory mitigating circumstance that the "defendant has no significant history of prior criminal activity." N.C.G.S. § 15A-2000(f)(1) (1988). During his testimony, Hedrick referred to the defendant's use of marijuana. The defendant argues that this was some evidence of criminal activity and, therefore, the trial court was required to instruct the jury to consider whether this amounted to no "significant" history of criminal activity. We disagree.

The trial court is not required to instruct upon a statutory mitigating circumstance unless substantial evidence has been presented to the jury which would support a reasonable finding by the jury of the existence of the circumstance. *See State v. Wilson*, 322 N.C. 117, 367 S.E. 2d 589 (1988); *State v. Lloyd*, 321

N.C. 301, 364 S.E. 2d 316 (1988). The term "substantial evidence" means "that the evidence must be existing and real, not just seeming or imaginary." *State v. Powell*, 299 N.C. 95, 99, 261 S.E. 2d 114, 117 (1980). The statutory mitigating circumstance of "no significant history of prior criminal activity" is not supported by the mere absence of any substantial evidence concerning the defendant's prior criminal history. *State v. Hutchins*, 303 N.C. 321, 355-56, 279 S.E. 2d 788, 809 (1981), *cert. denied*, 464 U.S. 1065, 79 L.Ed. 2d 207 (1984). A silent record in this regard does not require submission of the mitigating circumstance. *Id.* An affirmative showing of a complete absence of *any* history of criminal activity need not be made, but some substantial evidence concerning the defendant's history of prior criminal activity — or lack of it — must be presented to the jury before the trial court may determine as a matter of law that the jury could reasonably find this mitigating circumstance from the evidence. *State v. Lloyd*, 321 N.C. 301, 364 S.E. 2d 316 (1988).

We conclude that the jury could have made no such reasonable finding from evidence introduced in this case. Hedrick's cursory and unsubstantiated references to past marijuana use by the defendant were not, standing alone, substantial evidence as to whether the defendant had a significant history of criminal activity. A jury finding of no significant history of criminal activity, solely upon Hedrick's remarks about marijuana use, would have been based purely upon speculation and conjecture, not upon substantial evidence, and unreasonable as a matter of law.

We also note that at the defendant's request, the trial court gave the jury a peremptory instruction to find as a non-statutory mitigating circumstance that the defendant had not been previously convicted of a felony involving violence to the person. The trial court instructed the jury that, because no evidence had been introduced tending to show that the defendant had been convicted of such a felony, the jury must find that the defendant had no such record. Even if it is assumed *arguendo* that this non-statutory mitigating circumstance — reflecting mere absence of the statutory *aggravating* circumstance set out in N.C.G.S. § 15A-2000(e)(3) — may ever properly be submitted in a capital case, its submission to the jury here was, nevertheless, error favorable to the defendant. There was no evidence before the jury concerning the defendant's record of criminal convictions, and the mere absence of substantial evidence with regard to a mitigating circumstance will not support

a finding that the circumstance exists. *See State v. Hutchins*, 303 N.C. at 355-56, 279 S.E. 2d at 809. The defendant bears the burden of producing substantial evidence tending to show the existence of a mitigating circumstance before the circumstance will be submitted to the jury. *State v. Brown*, 306 N.C. 151, 293 S.E. 2d 569, *cert. denied*, 459 U.S. 1080, 74 L.Ed. 2d 642 (1982); *State v. Hutchins*, 303 N.C. at 355-56, 279 S.E. 2d at 809. In meeting this burden, however, the defendant is entitled to rely upon any substantial evidence which is before the jury in his case and tends to show the existence of the circumstance. *State v. Lloyd*, 321 N.C. at 311-12, 364 S.E. 2d at 323-24.

In the present case, counsel for the defendant and the prosecutor had informed the trial court, during a conference with the jury out of the courtroom, that the defendant had at least one prior misdemeanor conviction involving violence against the person but no record of violent felonies. However, no stipulation was entered to that effect nor was any *evidence* concerning the defendant's prior convictions—or lack of convictions—ever introduced for the jury's consideration. As a result, the evidence before the jury was totally silent on the question of whether the defendant had ever been convicted of a felony involving violence to the person and did not support the submission of this non-statutory "mitigating" circumstance for the jury's consideration. Therefore, the trial court's peremptory instruction requiring the jury to find and weigh as a non-statutory mitigating circumstance that the defendant had not previously been convicted of a felony involving violence to the person was error favorable to the defendant.

Assuming *arguendo* that the trial court's failure to submit the statutory mitigating circumstance of no significant history of prior criminal activity was error—although we have concluded it was not—the error was harmless beyond a reasonable doubt and, thus, does not require a new sentencing proceeding under the test for harmless error we apply in cases involving violations of rights guaranteed by the Constitution of the United States. *State v. Wilson*, 322 N.C. at 144, 367 S.E. 2d at 605; N.C.G.S. § 15A-1443(b) (1988). Given the lack of any substantial evidence on the matter of prior criminality of the defendant and the trial court's erroneous peremptory instruction—favorable to the defendant—that the jury must find the non-statutory mitigating circumstance of no prior convictions for violent felonies, the defendant received virtually the same benefit he would have received if the jury had found the statutory

mitigating circumstance of no significant history of prior criminal activity. Moreover, he received that benefit without the State being allowed to introduce his criminal record and other evidence of his prior criminal activity—apparently including at least one misdemeanor involving violence against a person—as the State could have done if the statutory mitigating circumstance had been submitted to the jury. Given this situation, we conclude that any error in failing to submit the statutory mitigating circumstance of no significant history of prior criminal activity was harmless beyond a reasonable doubt, at worst, and more probably was favorable to the defendant. This assignment is without merit.

[22] By his next assignment of error, the defendant contends he is entitled to a new sentencing proceeding because the trial court failed to submit to the jury the statutory mitigating circumstance of his age at the time of the crimes. N.C.G.S. § 15A-2000(f)(7) (1988). No evidence concerning the defendant's age was before the jury. Furthermore, although the defendant contends that he was twenty-three years old at the time of these crimes, chronological age is not the determinative factor with regard to this mitigating circumstance. *State v. Oliver*, 309 N.C. 326, 307 S.E. 2d 304 (1983). The defendant, whose only witness was Hedrick, introduced no substantial evidence of his immaturity, youthfulness or lack of emotional or intellectual development at the time of these crimes. On the contrary, Hedrick testified that the defendant had been a trustworthy, responsible and dependable employee who was soon to become an unsupervised construction foreman with a crew of his own. There being no substantial evidence before the jury concerning this statutory mitigating circumstance, the trial court correctly declined to submit it for the jury's consideration. *State v. Hutchins*, 303 N.C. at 355-56, 279 S.E. 2d at 809. *Cf. State v. Johnson*, 317 N.C. 343, 346 S.E. 2d 596 (1986) (twenty-three-year-old defendant not entitled to submission of age as a mitigating circumstance, notwithstanding family members' testimony that he was emotionally immature for his age).

[23] By his next assignment of error, the defendant contends that these murders were, as a matter of law, not "especially heinous, atrocious or cruel" and that submission of that statutory aggravating circumstance to the jury was error requiring a new sentencing proceeding. The defendant's argument is meritless.

Although every murder is to some degree heinous, atrocious or cruel, submission of this aggravating circumstance to the jury in a capital sentencing proceeding is appropriate only where there is evidence that the murder was especially heinous, or especially atrocious, or especially cruel. *State v. Lloyd*, 321 N.C. 301, 364 S.E. 2d 316; N.C.G.S. § 15A-2000(e)(9) (1988). We have held that the submission of this aggravating circumstance is appropriate where a first-degree murder involves a prolonged brutal attack inflicting injuries beyond what would be necessary to kill the victim. *State v. Lloyd*, 321 N.C. 301, 364 S.E. 2d 316. It is not necessary for the evidence to establish at what point death actually occurred during such an attack. *State v. Huffstetler*, 312 N.C. 92, 322 S.E. 2d 110 (1984).

In determining whether there is sufficient evidence to support a finding that a first-degree murder was especially heinous, atrocious or cruel, the evidence must be considered in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom. *State v. Moose*, 310 N.C. 482, 313 S.E. 2d 507 (1984). The evidence in this case would support a finding that both victims were unable to defend themselves due to extreme intoxication when the defendant began beating them severely with his fists. They remained helpless as he took a claw hammer from the car and proceeded to beat each helpless victim mercilessly about the head and torso with the hammer, causing numerous lacerations, bruises, skull fractures and areas of hemorrhaging. The victims were found in pools of blood, with pieces of flesh, skull and brain matter scattered about the bodies. Waddell had six broken ribs, many lacerations about the head and multiple skull fractures — including two "punched out" holes in his skull and areas where the skull had been pushed into the brain. He also had injuries to his face, neck and back. Kepley's skull had been literally "cracked open," and his wounds included a fracture extending across the base of the skull and "punched out" holes in the skull. One side of the skull was so mutilated that medical examiners could not determine how many blows had been inflicted. Like Waddell's, parts of Kepley's skull had been driven down into his brain. The clothing of the defendant and Watts was covered with blood, hair, brain matter and "meat."

Our decision in *Huffstetler* is dispositive of this assignment. In *Huffstetler*, the victim was beaten to death with a cast iron skillet which caused numerous severe injuries to her skull, neck

STATE v. LAWS

[325 N.C. 81 (1989)]

and upper torso. We held that the severity and brutality of the numerous wounds amply justified submission of the especially heinous, atrocious or cruel aggravating circumstance. 312 N.C. at 116, 322 S.E. 2d at 125. Its submission to the jury in this case was equally justified by the prolonged brutal attacks which were required to inflict Waddell's and Kepley's gruesome injuries and to produce the other gruesome evidence in this case.

[24] By his next assignment of error, the defendant contends he is entitled to a new sentencing proceeding because the prosecutor improperly referred to the decision of this Court in *Huffstetler* to bolster his argument that the jury should find that these first-degree murders were especially heinous, atrocious or cruel. After explaining this aggravating circumstance and arguing that the facts of this case warranted such a finding, the prosecutor made the following statement to the jury:

> There's a case of State of North Carolina versus Huffstetler, a similar situation, a beating death. This very aggravating circumstance, especially cruel, heinous and [sic] atrocious, was submitted to the jury. This woman died as a result of being battered to death with a cast iron skillet so as to cause her skull to be pushed into her brain, the very same thing as this case. And you remember the testimony of the doctor that the skull was knocked down into the brain with the force of the hammer. "The severity and the brutality of the numerous wounds inflicted amply justified submission of this aggravating circumstance to the jury." That's what our Supreme Court said. It's properly before you, that aggravating circumstance, and you should answer it yes, because the State's satisfied you beyond a reasonable doubt that this particular beating death, the type you see here in these pictures [of the victims], is especially cruel, heinous and [sic] atrocious.

The defendant argues that this statement, which was not objected to at trial, violated the prohibition of *Wilcox v. Motors Co.*, 269 N.C. 473, 153 S.E. 2d 76 (1967), in which we held that it was improper for counsel in arguing to the jury to set forth the facts and decision of another case and then argue that the jury's decision should be the same as that in the other case because the facts before the jury were the same as those in the other case. We also said in *Wilcox*, however, that it was permissible for counsel in argument to state his view of the law applicable

to the case on trial, to read published decisions of this Court in support thereof, and to recount some of the facts on which those other decisions were based. 269 N.C. at 479, 153 S.E. 2d at 81.

Assuming *arguendo* that the prosecutor's unobjected-to reading from *Huffstetler* and argument in this regard were so grossly improper as to require the trial court to intervene *ex mero motu*, we nevertheless conclude that the defendant has failed to show any resulting prejudice in light of the overwhelming evidence of this aggravating factor introduced at trial. *See generally State v. Austin*, 320 N.C. 276, 357 S.E. 2d 641, *cert. denied*, --- U.S. ---, 98 L.Ed. 2d 224 (1987). Furthermore, the trial court subsequently instructed the jury that it was the jury's responsibility to determine from the evidence before it whether the murders were especially heinous, atrocious or cruel. This assignment of error is without merit.

[25]    By his next assignment of error, the defendant contends that the prosecutor misused this Court's decisional law in arguing for a finding of the aggravating circumstance that each murder was committed as part of a course of conduct that included a crime of violence against another person. After explaining to the jury that it could consider the defendant's attack on each victim in aggravation of the murder of the other, the prosecutor added:

> The Supreme Court of this State as to that aggravating circumstance has said this: "It is the very fact that the defendant killed two people, and not just one, that aggravates the nature of his crimes, and it [is] entirely proper for the jury to consider this fact in determining whether the defendant should pay the ultimate price for *each* life he took," the ultimate price meaning death.

Considering the prosecutor's statement, including his use of the quotation taken from *State v. Pinch*, 306 N.C. 1, 32, 292 S.E. 2d 203, 226 (1982), in the context in which that statement was made, we detect no error. The prosecutor had just recited to the jury, practically verbatim, the statutory language of this aggravating circumstance and had explained to the jury that in finding and weighing aggravating circumstances with regard to the murder of either victim, it could consider the defendant's violent course of conduct against the other victim. In that context, a fair interpretation of the prosecutor's reference to the decisional law of this Court would be that this Court had said that this aggravating

circumstance exists when the defendant engages in a course of violent criminal conduct against two persons and thereby kills them. That is a fair statement of the law.

[26]  The defendant also argues that a proper reading of our holding in *Pinch* is that a jury may treat this statutory circumstance as aggravating the crime of first-degree murder, but is not required to do so, after it has found the requisite course of conduct establishing the existence of the circumstance. We disagree.

We have held that our legislature, by listing specific mitigating circumstances to be considered in capital sentencing under N.C.G.S. § 15A-2000(f), has determined that such circumstances, if supported by substantial evidence and found by the jury, *shall* be considered mitigating during capital sentencing. *State v. Kirkley*, 308 N.C. 196, 302 S.E. 2d 144 (1983). We now hold for the same reasons that by enacting specific aggravating circumstances to be considered in capital sentencing, the legislature intended that a jury having found one of those statutory aggravating circumstances to exist must give it some weight in aggravation when determining the appropriate sentence to recommend. N.C.G.S. § 15A-2000(b) (1988). The amount of weight to be given such statutory aggravating circumstances is, however, left to the determination of the jury. N.C.G.S. § 15A-2000(c) (1988). Allowing the jury the discretionary power to completely disregard those circumstances specifically enumerated by our legislature and found from the evidence to exist—whether aggravating or mitigating circumstances—would return the sentencing proceedings in capital cases to the realm of unguided jury discretion, rendering any resulting death sentences constitutionally suspect. *See State v. Kirkley*, 308 N.C. at 220, 302 S.E. 2d at 158. This assignment is without merit.

[27]  By his next assignments of error, the defendant contends that the prosecutor's closing argument in the sentencing proceeding included several transgressions which were so grossly improper that this Court should grant a new sentencing proceeding, notwithstanding his defense counsel's failure to object. The defendant first argues that statements by the prosecutor to the effect that the victims were entitled to the protection of the law, even though they were just average people suffering sickness and weakness, violated the prohibitions of *Booth v. Maryland*, 482 U.S. 496, 96 L.Ed. 2d 400 (1987). The prosecutor's brief references to the victims and their families in his closing argument during the sentencing

proceeding in this case did not inject highly prejudicial, irrelevant and improper matters such as those contained in the victim impact statements prohibited by *Booth*, and the potential impact of these references was *de minimis*. *See State v. McNeil*, 324 N.C. 33, 375 S.E. 2d 909 (1989) (prosecutor's statement that he represented the victim, and reference to certain characteristics of the victim and what was probably going through her mind as she was being killed, were not so grossly improper as to require *ex mero motu* intervention); *State v. Brown*, 320 N.C. 179, 358 S.E. 2d 1 (1987) (effect of reference during sentencing argument to the victim's family's rights, even if erroneous, was *de minimis*, and the trial court did not abuse its discretion in failing to act *ex mero motu*). To the contrary, the argument correctly emphasized to the jury that it should not consider the victims' social status — either high or low status — in deciding whether to recommend a sentence of death. *See generally South Carolina v. Gathers*, No. 88-305, --- U.S. ---, --- L.Ed. 2d --- (12 June 1989), 49 CCH S.Ct. Bull., p. B2964. Therefore, any possible transgression by the prosecutor here was not so grossly improper as to require the trial court to intervene *ex mero motu. Id.*

[28]  The defendant next complains of the prosecutor's criticism of our capital sentencing laws when he declared that it was "pathetic" that consideration of the "especially heinous, atrocious or cruel" statutory aggravating circumstance requires the jury "to decide that some murders — can you believe this? — are worse than others." The prosecutor immediately added, however, that the law required such distinctions, that the jury had to follow the law, and that the jury must find that the murders were "*especially* heinous, atrocious and [sic] cruel" before it could find this aggravating circumstance. At no time during the prosecutor's argument or the trial court's charge was it suggested that the jury could find or weigh this aggravating circumstance without first finding from the evidence that the murders were in fact *especially* heinous, atrocious or cruel. Both the prosecutor and trial court admonished the jury to apply the law as it was and not as they might like the law to be or think it should be. The prosecutor's unobjected-to commentary, while inappropriate, was not so grossly improper as to require the trial court to intervene *ex mero motu*. Any resulting effect of such comments was *de minimis* in light of the fact that the jury was told at all times it must follow the law and that the law required that the first-degree murders be *especially* heinous, atrocious or cruel for this circumstance to exist.

[29]  The defendant next argues that the prosecutor misstated the law governing the statutory mitigating circumstance of "impaired capacity," N.C.G.S. § 15A-2000(f)(6), in a way as to encourage jurors to give little weight to that circumstance. After quoting the language of the statutory mitigating circumstance, the prosecutor explained it as follows:

> Now that is some catchall. What that means is this: There's something so bad with my head up here that I just don't know why I did that, and if I hadn't have been that way, well, I surely wouldn't have done that. That's almost like I heard one time, "Well, I'm sorry I did it. I didn't mean to do it. I'm sorry I did it."

We note that despite the prosecutor's comments, the jury found this statutory circumstance in mitigation of the crimes. The only evidence in support of this mitigating circumstance was that the defendant and Watts had been drinking an unspecified quantity of beer for several hours and that the defendant had told officers that he could not remember anything that happened after picking up the victims. This was contradicted by Watts' testimony that the next day the defendant threatened to kill him if he told anybody about the killings. Thus, while some of the prosecutor's language may have oversimplified the law concerning this circumstance and might have been construed as additional improper commentary on our sentencing law, his argument did not rise to the level of gross impropriety requiring the trial court to intervene *ex mero motu*, as any potential impact of the statements was *de minimis*.

[30]  The defendant next argues that the prosecutor improperly limited the scope of the matters in mitigation, which the jury could have found and weighed under the "any other circumstance" provision of N.C.G.S. § 15A-2000(f)(9), when he explained this circumstance as follows:

> And, number five, any other circumstance arising from the evidence which you the jury deem to have mitigating value. And that's just what I said it was. That's anything else that you can derive from any of this why you think he's entitled to some help. That's the bottom line. And, as I told you, this case is not a question of sympathy for anybody or prejudice against anybody.

The prosecutor's statement essentially told the jurors that they could find any circumstance supported by the evidence to be mitigating. Taken in its entirety, it would have been reasonably interpreted by jurors only as an admonition to base their finding and weighing of "any other circumstance" in mitigation upon the evidence and not upon their emotions. Further, any possible confusion was corrected by the trial court's correct instructions on mitigating circumstances in its sentencing proceeding charge.

[31] The defendant next argues that the prosecutor improperly alluded to the possibility of parole by arguing that the death penalty was "the only way, the only way, we're ever going to be sure that this man over here will never do what he's done again." The defendant acknowledges that such arguments invoking deterrence have been upheld. *E.g.*, *State v. Zuniga*, 320 N.C. 233, 357 S.E. 2d 898 (1987). This assignment of error is without merit.

[32] The defendant also argues that certain Biblical references by the prosecutor in his sentencing argument were so grossly improper that, despite the absence of an objection, the trial court was required to intervene *ex mero motu*. These references included the following:

> We are imperfect people and the law is imperfect. The Bible, in Genesis 9, says: "Whoso sheddeth man's blood, by man shall his blood be shed: for in the image of God made he man." That's the Old Testament, and I'm old-fashion and I believe that way. You've got the New Testament. The New Testament says "Vengeance is mine, sayeth the Lord."

> And as Jesus said, "Render unto Caesar that which is Caesar's and unto the Lord that which is the Lord's." There are two kinds of law: there's God's law and there's man's law. We're trying to sit here and do what's right by man's law, and yet man's law is based on God's law, one of the commandments being, "Thou shalt not kill." This man has killed his fellow man.

The defendant cites cases in which Biblical arguments have been disapproved. *E.g.*, *State v. Moose*, 310 N.C. 482, 313 S.E. 2d 507 (1984). In such cases, however, the arguments were to the effect that the law enforcement powers of the State came from God, and to resist those powers was to resist God. The prosecutor's Biblical references in this case, while they offered virtually nothing to help the jury in its deliberations concerning the law and the

**STATE v. LAWS**

[325 N.C. 81 (1989)]

evidence, did not amount to his claiming that his authority came from God or that to resist his authority was to resist God. On the contrary, the prosecutor pointed out that the jury's task was to do what was right by man's law. The potential impact of the prosecutor's Biblical references in this case was slight, and they did not amount to gross impropriety requiring the trial court's intervention *ex mero motu. See State v. Zuniga*, 320 N.C. 233, 357 S.E. 2d 898 (1987) (similar Biblical references held to be of minimal prejudicial effect and not so improper as to require trial court's intervention).

The defendant also has brought forward eleven additional issues and supporting assignments and arguments. His appellate counsel, who did not represent him at trial, has exhibited commendable candor and accuracy in noting that these issues, some of which are currently scheduled for consideration in cases pending before the Supreme Court of the United States, have been or by logical extension of our prior cases would be resolved adversely to the defendant's position by this Court. Although we acknowledge that the defendant has preserved these issues for possible further review by the Supreme Court of the United States, we conclude that these assignments of error are without merit.

[33] Having found no prejudicial error either in the defendant's trial or sentencing proceeding, we undertake the duties reserved by statute for this Court in reviewing the judgment and sentence of death. N.C.G.S. § 15A-2000(d)(2) (1988). In fulfilling those duties, we must ascertain whether the record supports the jury's findings of the aggravating circumstances on which the sentence of death was based; whether the sentence of death was imposed under the influence of passion, prejudice, or any arbitrary circumstance; and whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. *Id.*

Having thoroughly examined the record, transcripts and briefs in this case, we conclude that the trial court properly submitted the aggravating circumstances which were considered and found by the jury. Additionally, we find no indication that the sentence of death was recommended or entered under the influence of passion, prejudice, or any arbitrary circumstance.

We turn, then, to our final statutory duty of proportionality review. That duty requires this Court to determine whether the

death sentences in this case are excessive or disproportionate when compared to the penalty imposed in similar cases. Our task in proportionality review is to compare this case with other first-degree murder cases in the proportionality pool which are roughly similar to this case with regard to the crime and the defendant. *State v. Lloyd*, 321 N.C. 301, 364 S.E. 2d 316. Although the proportionality pool of cases is used for comparison purposes, proportionality review requires that each case be evaluated by independent consideration of the particular circumstances and characteristics of the defendant and the crime or crimes he has committed. *Id.* We have rejected, for constitutional reasons, any approach that would evaluate an individual defendant's sentence by mathematical or statistical comparisons with other cases and deny him individualized sentence review. *Id.* While we review all the cases in the pool each time proportionality review is undertaken, we do not cite or discuss all of the cases in the pool with each decision. *Id.*

In the present case, the defendant was convicted of two counts of premeditated and deliberate first-degree murder. He brutally and literally beat the brains out of two heavily intoxicated victims for no apparent reason. He mutilated portions of their skulls while beating them to death with a claw hammer and left them lying on a rural dirt road in pools of blood, hair, flesh, brain matter and pieces of skull. Each had been beaten about the head, neck and torso with the hammer and suffered injuries far beyond those required to incapacitate or even kill them. One victim also had six broken ribs. At least one of the victims was already incapacitated and lying motionless on the ground when the savage attacks with the hammer began. The defendant had met the victims only a few hours before and apparently had no quarrel with them as they traveled to the isolated area where the brutal killings took place.

The jury found two aggravating circumstances: that each murder was especially heinous, atrocious or cruel, and that each murder was committed during a course of conduct which involved crimes of violence against another person. The jury found four mitigating circumstances: the defendant had no prior felonies involving violence against persons, the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the law was impaired, the defendant had been a good and responsible employee, and the defendant had financially assisted his family.

Comparing this defendant and his crimes to the other cases in the proportionality pool, we do not find that this case is even remotely similar to those cases in the pool in which we have over-turned death sentences as disproportionate. None of those cases involved the savage, prolonged killing process evident in this case. Further, "[i]n none of these cases was the defendant convicted of more than one murder." *State v. McNeil*, 324 N.C. at 60, 375 S.E. 2d at 925. A heavy factor to be weighed against the defendant " 'is that he is a multiple killer.' " *Id.* (quoting *State v. Robbins*, 319 N.C. 465, 529, 356 S.E. 2d 279, 316 (1987) ). In only one of those cases, *State v. Bondurant*, 309 N.C. 674, 309 S.E. 2d 170 (1983), did the jury find the aggravating circumstances found in this case. In *Bondurant*, the defendant and a group of friends, all highly intoxicated, were riding around in a car when the defend-ant began taunting the victim and asking him if he thought the defendant would shoot him. The defendant shot the victim, but then immediately had the driver take the victim to the local hospital. This case is not closely similar to *Bondurant*.

Comparing this case to those in the proportionality pool in which we have upheld death penalties, we conclude that it is closely similar to several of those cases in the brutal and senseless nature of the killing, the helplessness of the victims, and the killing of more than one victim in savage fashion. We note in particular *State v. Huffstetler*, 312 N.C. 92, 322 S.E. 2d 110 (1984), where the defendant beat his mother-in-law to death in her home with a cast iron skillet in much the same fashion as the defendant in this case bludgeoned *two* helpless victims to death. In upholding the death sentence in *Huffstetler*, we concluded that the record before us revealed a "senseless, unprovoked, exceptionally brutal, prolonged and murderous assault." 312 N.C. at 118, 322 S.E. 2d at 126. The gruesome record before us in this case reveals *two* murders, each equally as brutal and senseless as the one in *Huffstetler*.

The defendant suggests that particular weight should be given to the mitigating circumstance of his impaired mental capacity, and notes that this factor has been present in many cases where life sentences were recommended by a jury. As noted elsewhere in this opinion, however, the defendant's evidence of this circumstance was weak, only that he had been drinking for several hours and that he told police he could not remember the killings. The defend-ant's claimed lack of memory was contradicted by Watts' testimony.

**STATE v. LAWS**

[325 N.C. 81 (1989)]

Further, death sentences have been recommended by juries and upheld by this Court where the evidence of impaired mental capacity resulting from the defendant's intoxication was more substantial than in the present case. *E.g.*, *State v. Huffstetler*, 312 N.C. 92, 322 S.E. 2d 110 (1984).

Having compared this defendant and his crimes with those in all of the cases in the proportionality pool, we conclude that his death sentences are not disproportionate. Accordingly, we hold that this is not a proper case in which to exercise our statutory authority to set aside a sentence of death as disproportionate. We leave the judgments and sentences of death entered against the defendant undisturbed.

No error.

Justice FRYE concurring in result.

One of the preservation issues raised by defendant relates to the applicability of the United States Supreme Court's decision in *Mills v. Maryland*, 486 U.S. ---, 100 L. Ed. 2d 384 (1988), to the unanimity requirement for mitigating circumstances in determining whether death is the appropriate punishment in a given case. This issue is now pending before the Supreme Court of the United States. *See State v. McKoy*, 323 N.C. 1, 372 S.E. 2d 12 (1988), *cert. granted*, --- U.S. ---, 103 L. Ed. 2d 180 (1989). While I believe that *Mills* is applicable to North Carolina, *see State v. Lloyd*, 321 N.C. 301, 364 S.E. 2d 316, *vacated and remanded on other grounds*, --- U.S. ---, 102 L. Ed. 2d 18, *reinstated*, 323 N.C. 622, 374 S.E. 2d 277 (1988), Exum, C.J., and Frye, J., dissenting, assuming error arguendo, I would find the error nonprejudicial under the peculiar circumstances of this case.