STATE OF NORTH CAROLINA v. DAVID JAMES MASH

No. 728A86

(Filed 6 October 1988)

1. **Homicide § 8.1— first degree murder—defense of intoxication—erroneous instruction**

   The trial court erred in a first degree murder prosecution in its instructions on defendant's voluntary intoxication because the instructions imposed on the jury the standard applicable to defendant's burden of production at trial rather than the standard applicable to the jury's consideration of the intoxication evidence, and the manner in which the language was inserted into the instructions could have led a rational jury to believe that defendant bore the burden of persuading the jury that he was so intoxicated as to be unable to form a deliberate and premeditated intent to kill.

2. **Homicide § 8.1— first degree murder—defense of intoxication—sufficiency of evidence**

   The evidence in a first degree murder prosecution was sufficient to support an instruction on voluntary intoxication where defendant had been seen drinking periodically from around 4:00 p.m. until 11:00 p.m. on the date of the murder; during the afternoon defendant appeared "high" while drinking more beer with another friend; by early evening he was drinking a mixture of 190 proof grain alcohol and punch; witnesses described defendant as "definitely drunk" and "pretty high" by 9:30 p.m.; defendant swerved while driving his automobile to obtain more beer; after stopping at a package store parking lot to meet some friends, defendant left by himself for thirty or forty minutes and, upon returning, he appeared "changed all the way around" and "drunker, wilder and out of control"; defendant's eyes were dilated, his complexion had changed, he was sweating and had difficulty speaking or walking; unprovoked, he had inexplicably and viciously assaulted a girlfriend and several strangers; the fatal assault was likewise unprovoked and, except for defendant's reference to the victim's having guarded defendant's brother, inexplicable; and the manner of the assault and defendant's actions immediately before and after were themselves equivocal on the question of whether the defendant actually deliberated and premeditated. Moreover, the district attorney, counsel for defendant and the trial judge all seemed to view the evidence as sufficient to require the voluntary intoxication instruction.

3. **Homicide § 32.1— first degree murder—defense of intoxication—erroneous instruction—prejudicial**

   The trial court's error in its instruction on voluntary intoxication in a first degree murder trial was prejudicial where, although there was little question that defendant had committed a homicide, the case was relatively close on the degree of culpability and the issue of whether defendant should be found guilty of first or second degree murder hinged largely on how the jury would consider the evidence of defendant's intoxication. N.C.G.S. § 15A-1443.

APPEAL pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing the death sentence entered at the 17 November 1986 Criminal Session of Superior Court, WILKES County, *Washington, J.*, presiding. By order dated 19 December 1986 this Court stayed execution pending defendant's appeal. Heard in the Supreme Court on 10 May 1988.

*Lacy H. Thornburg, Attorney General, by Joan H. Byers, Special Deputy Attorney General, and John H. Watters, Assistant Attorney General, for the state.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Louis D. Bilionis, Assistant Appellate Defender, for defendant appellant.*

*Smith, Patterson, Follin, Curtis, James & Harkavy, by Norman B. Smith, for North Carolina Civil Liberties Union Legal Foundation, Inc., amicus curiae.*

EXUM, Chief Justice.

The sole issue dispositive of this appeal is whether the trial court erroneously instructed the jury on the issue of defendant's voluntary intoxication to defendant's prejudice. We conclude it did and order a new trial.

I.

The defendant and the state agree that in a period of minutes around 11 p.m. on 5 June 1986, the defendant beat Randall Cupp to death with a car jack. State's evidence in the guilt phase of the trial tended to show the following:

Defendant's friends first saw him drinking beer in the driveway of his mother's house around 4 p.m. on 5 June. They saw him shortly thereafter at the home of a neighbor, Betty Melton, where he was also drinking beer. Sometime after this, defendant was seen in the parking lot of Royal's Package Store, again drinking beer. From there, defendant drove to a neighborhood gathering place, "The Forks," where he stayed about fifteen minutes. Defendant then drove to the home of Danny Schneider, where around 8 p.m., he and others were drinking an alcoholic beverage consisting of a mixture of grain alcohol and fruit punch. Around 9:30 p.m., defendant decided to make a "beer run." Driving his own car and taking some of his friends with him, he left

Danny Schneider's house. He stopped for the second time that evening in the parking lot of Royal's Package Store, where a crowd of people had gathered. The store had closed for the evening, but the events leading to the murder of Randall Cupp took place in the store parking lot.

None of the witnesses testified as to how much alcohol the defendant consumed on 5 June, but several described how he acted and appeared during the evening. In the opinion of one witness, defendant was quiet and polite when sober but became profane, loud, boisterous and crazy when drunk. Witness Dean Long, a friend of the defendant, said that on 5 June, defendant was already "high" around 4 p.m. before drinking beer at his mother's house. Long testified defendant was definitely drunk at Danny Schneider's house and continued to drink on the "beer run." Another of defendant's friends testified that defendant swerved as he drove and was "pretty high." Another witness recalled that defendant drove slowly but swerved.

Shortly after arriving at Royal's Package Store for the second time, defendant drove away alone in a friend's car and was gone about 30 minutes. His friends testified that upon returning, he drove the car up and down the road in front of the store, "spinning doughnuts." One of his friends testified that after defendant got out of the car, his eyes were red and he was staggering. Another friend testified that defendant's appearance and behavior were changed in that he was "drunker, wilder and out of control." His eyes were dilated, his face was red and he was sweating. His tongue was so tight he could hardly talk. He staggered and seemed dazed. Another witness described the defendant at this time as, "pretty darn [sic] drunk." Defendant continued to drink beer in the parking lot.

At this point, some other young men drove up in a car. Defendant threw a beer bottle against a wall. When one of his friends criticized this act, he responded by hitting her once in the mouth, drawing blood. Defendant then asked the newly arrived men what they were looking at. The testimony of the witnesses varied as to what happened next, but defendant engaged in fights with either one or two of the men. One witness said defendant fought with a man in the car, trying to pull him out of the vehicle. Another witness said defendant chased and caught one of the men

and was on the ground on top of the man, beating him. Another friend testified defendant had to be pulled off because he was too rough on the victim. According to uncontradicted testimony, as defendant's friends pulled defendant away, he tried to shake them off and struck one of them four times in the back. The friend did not respond or retaliate because he thought this would make defendant even more angry.

Randall and Faye Cupp lived across the road from Royal's Package Store. Mr. Cupp was a correctional officer at the Alexander County Prison Unit, where defendant's brother had been incarcerated. Mr. Cupp had come home from work around 10:30 that evening and he and his wife had retired for the night. Two of defendant's friends rang the Cupps' doorbell around 11 p.m., while defendant was driving up and down in front of Royal's, and asked the Cupps not to call law enforcement officers. The Cupps looked out their window and saw defendant's car, but they took no action. About ten minutes later, the doorbell rang again. This time defendant's friends asked for help. They told the Cupps how defendant had struck one of them in the mouth and how he was fighting, so Cupp decided to go over to the store.

Randall Cupp, wearing trousers and shoes, but no shirt, went to the parking lot. One witness testified defendant did not seem to recognize Cupp, and two other witnesses heard defendant say Cupp had a gun. Defendant went to the trunk of his car and opened it. He took out a jack, left the trunk lid open, and approached Mr. Cupp, who had bent down as if to tie his shoe. Two witnesses testified defendant said, "You guarded my brother, now see if you can guard me." Three witnesses said defendant struck the first blow, hitting Mr. Cupp with the jack. Although Mr. Cupp tried to ward off the blow and to hit defendant with a karate chop on the back of the neck, he was unsuccessful. Defendant quickly struck the victim again and continued to strike him as he lay upon the ground. When one of the bystanders screamed for him to stop, he stopped, walked toward her and began to cry.

Medical evidence indicated the six blows to the head suffered by the victim rendered him unconscious "immediately" and death followed a few minutes thereafter. The victim's brain injuries included bleeding into the subdural spaces and herniation or swelling. The swelling caused cardiac and respiratory arrest; pul-

monary edema followed. Defendant's friend, Dean Long, testified that he and defendant together carried the victim across the road. Mr. Long performed cardiopulmonary resuscitation techniques on the victim and asked defendant to help. When defendant said he did not know how, Mr. Long showed him what to do.

Deputy Thomas Eller of the Wilkes County Sheriff's Department answered a call placed by Mrs. Cupp and arrived while Mr. Long and the defendant were trying to revive the victim. Detective Chris Shew of the Wilkes County Sheriff's Department arrived about 12:15 a.m. Defendant knew Detective Shew, called him by name, and conversed with him. He told Detective Shew that he had been passing by and stopped to see if he could help. He offered to let Detective Shew search his car and, in Detective Shew's opinion, walked normally and talked clearly. Shew looked in the car and saw the jack on the floor behind the driver's seat. Later Deputy Eller took the jack from the car at Shew's instruction.

Defendant offered no evidence.

## II.

[1] Defendant contends the trial judge incorrectly instructed the jury concerning defendant's voluntary intoxication. We agree.

In *State v. Wilson*, 280 N.C. 674, 187 S.E. 2d 22 (1972), this Court held the following instructions properly stated the law regarding a jury's consideration of evidence pertaining to a defendant's voluntary intoxication:

> There is evidence in this case which tends to show that the defendant was intoxicated at the time of the acts alleged in this case. Generally, voluntary intoxication is not a legal excuse for crime. However, if you find that the defendant was intoxicated, you should consider whether this condition affected his ability to formulate the specific intent which is required for conviction of first degree murder.

> In order for you to find the defendant guilty of first degree murder, you must find beyond a reasonable doubt that he killed the deceased with malice and in the execution of an actual, specific intent to kill formed after premeditation and deliberation.

If as a result of intoxication the defendant did not have the specific intent to kill the deceased . . . formed after premeditation and deliberation, he is not guilty of first degree murder.

Therefore, I charge you that if upon considering the evidence with respect to the defendant's intoxication you have a reasonable doubt as to whether the defendant formulated the specific intent required for a conviction of first degree murder, you will not return a verdict of first degree murder. You will then consider whether or not he would be guilty of second degree murder.

*Id.* at 681, 187 S.E. 2d at 26. This instruction was not only held to be proper in *Wilson*, but it is also the language recommended to our trial judges in North Carolina's *Pattern Jury Instructions for Criminal Cases. See* N.C.P.I. Crim. 305.11.

Defendant requested this instruction at trial. The district attorney requested instructions that in effect negated the specific intent element only if defendant's intoxication was

so great that his mind and reason were so completely overthrown as to render him utterly incapable to form a deliberate and premeditated purpose to kill. Mere intoxication cannot serve as an excuse for the defendant. It must be intoxication to the extent that the defendant's mental processes were so overcome by the excessive use of liquor or other intoxicants that he temporarily, at least, lost the capacity to think and plan.

The trial judge relied in large part upon defendant's requested instruction; but he also inserted the district attorney's request and instructed the jury as follows:

The defendant contends that he should be excused because he was drunk. You may find there is evidence which tends to show that the defendant was drunk or intoxicated at the time the acts alleged in this case. Generally voluntary intoxication is not a legal excuse for crime. The law does not permit a person who commits a crime in the state of intoxication to use his own vice or weakness as a shelter against the normal legal consequences of his conduct. However, if you find that the defendant was intoxicated, you should consider whether

State v. Mash

this condition affected his ability to formulate specific intent which is required for conviction of first degree murder. In order to find the defendant guilty of first degree murder, you must find beyond a reasonable doubt that he killed the deceased with malice and in the execution of an actual specific intent to kill formed after premediation [sic] and deliberation. If, as a result of intoxication, the defendant did not have the specific intent to kill the deceased formed after premediation [sic] and deliberation, then he would not be guilty of first degree murder. *However, the intoxication must be so great that his mind and reason were so completely overthrown so as to render him utterly incapable to form a deliberate and premediated [sic] purpose to kill. Mere intoxication cannot serve as an excuse for the defendant. It must be intoxication to the extent that the defendant's mental processes were so overcome by the excessive use of liquor or other intoxicants that he had temporarily, at least, lost the capacity to think and plan.* The law does not require any specific intent for the defendant to be guilty of the crimes of second degree murder or voluntary manslaughter. Thus, the defendant's intoxication can have no bearing upon your determination of his guilt or innocence of these crimes or lesser included offenses of the crime of first degree murder. Therefore, upon the charge of first degree murder, I charge you that upon considering the evidence with respect to the defendant's intoxication, you have a reasonable doubt as to whether the defendant formulated this specific intent required for conviction of first degree murder you would not return a verdict of guilty of first degree murder. (Emphasis supplied.)

While most of these instructions are correct, the italicized portions place a substantially heavier burden on defendant than the law requires him to bear.

On the element of a deliberate and premeditated specific intent to kill in a first degree murder case defendant has no burden of persuasion at all; the burden of persuasion on the existence of this element remains throughout the trial on the state. The state must persuade the jury beyond a reasonable doubt that every essential element of a homicide exists. *Mullaney v. Wilbur*, 421 U.S. 684, 44 L.Ed. 2d 508 (1975); *State v. Hankerson*, 288 N.C. 632, 220

S.E. 2d 575 (1975), *rev'd on other grounds*, 432 U.S. 233, 53 L.Ed. 2d 306 (1977).

A defendant who wishes to raise an issue for the jury as to whether he was so intoxicated by the voluntary consumption of alcohol that he did not form a deliberate and premeditated intent to kill has the burden of producing evidence, or relying on evidence produced by the state, of his intoxication. Evidence of mere intoxication, however, is not enough to meet defendant's burden of production. He must produce substantial evidence which would support a conclusion by the judge that he was so intoxicated that he could not form a deliberate and premeditated intent to kill.

> The evidence must show that at the time of the killing the defendant's mind and reason were so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill. *State v. Shelton*, 164 N.C. 513, 79 S.E. 883 (1913). In absence of some evidence of intoxication to such degree, the court is not required to charge the jury thereon. *State v. McLaughlin*, 286 N.C. 597, 213 S.E. 2d 238 (1975).

*State v. Strickland*, 321 N.C. 31, 41, 361 S.E. 2d 882, 888 (1987) (quoting *State v. Medley*, 295 N.C. 75, 79, 243 S.E. 2d 374, 377 (1978)).

Once evidence of this quality has been produced in the trial, the jury must be instructed on the issue of defendant's deliberate and premeditated intent in light of this evidence. The burden of persuading the jury on this issue resting always with the state, the state must satisfy the jury beyond a reasonable doubt that, despite evidence of defendant's intoxication, defendant did form a deliberate and premeditated intent to kill. For the jury, evidence of defendant's intoxication need only raise a reasonable doubt as to whether defendant formed the requisite intent to kill required for conviction of first degree murder in order for defendant to prevail on this issue. *State v. Wilson*, 280 N.C. 674, 187 S.E. 2d 22; N.C.P.I. Crim. 305.11.

The vice in the instructions complained of is twofold: First, the instructions impose on the jury the standard applicable to defendant's burden of production at trial, a burden defendant must meet before being entitled to voluntary intoxication instruc-

tions at all. While meeting such a standard is a prerequisite to defendant's entitlement to voluntary intoxication instructions, the standard is inapplicable to the jury's consideration of the intoxication evidence. The jury must decide, in light of the intoxication evidence as well as other evidence in the case, whether there is a reasonable doubt that defendant formed a deliberate and premeditated intent to kill, not whether his intoxication was "so great . . . as to render him utterly incapable" of forming such an intent. In other words, to find for defendant on the intoxication issue, the jury does not have to conclude that his intoxication rendered defendant "utterly incapable" of forming the necessary intent; it need only conclude that because of his intoxication either defendant did not form the requisite intent or there is at least a reasonable doubt about it.

Second, the manner in which this complained of language was inserted into the instructions could have led a rational jury to believe that defendant bore the burden of persuading the jury that he was so intoxicated as to be unable to form a deliberate and premeditated intent to kill. So understood, the instructions would impermissibly and unconstitutionally shift the burden of persuasion on essential elements of the crime of first degree murder from the state to the defendant. *Mullaney v. Wilbur*, 421 U.S. 684, 44 L.Ed. 2d 508; *State v. Hankerson*, 228 N.C. 632, 220 S.E. 2d 525.

## III.

[2] The state argues that any error in the instruction on voluntary intoxication was harmless because the evidence is insufficient to require such an instruction. The trial court, the state says, erred in favor of defendant in giving such an instruction at all.

In certain instances voluntary drunkenness, while not an excuse for a criminal act, may be sufficient to negate the requisite intent element. *State v. Propst*, 274 N.C. 62, 161 S.E. 2d 560 (1968). However, "[n]o inference of the absence of deliberation and premeditation arises from intoxication, as a matter of law." *State v. Murphy*, 157 N.C. 614, 619, 72 S.E. 1075, 1077 (1911). "[A] person may be excited, intoxicated and emotionally upset, and still have the capability to formulate the necessary plan, design, or intention to commit murder in the first degree." *State v. Hamby*, 276

N.C. 674, 678, 174 S.E. 2d 385, 387 (1970) (quoting *State v. Thompson*, 110 Utah 113, 123, 170 P. 2d 153, 158 (1946) ). Even though a person's blood alcohol content is such that driving would violate the motor vehicle laws, this alone does not entitle the person to an instruction on voluntary intoxication. *State v. Medley*, 295 N.C. 75, 243 S.E. 2d 374 (1978). As we have already noted, in order for an instruction on voluntary intoxication to be required the evidence must be that defendant's intoxication rendered him "utterly incapable" of forming a deliberate and premeditated intent to kill. *State v. Strickland*, 321 N.C. at 41, 361 S.E. 2d at 888.

When determining whether the evidence is sufficient to entitle a defendant to jury instructions on a defense or mitigating factor, courts must consider the evidence in the light most favorable to defendant. *State v. McCray*, 312 N.C. 519, 324 S.E. 2d 606 (1985); *State v. Montague*, 298 N.C. 752, 259 S.E. 2d 899 (1979); *State v. Spaulding*, 298 N.C. 149, 257 S.E. 2d 391 (1979); *State v. Watkins*, 283 N.C. 504, 196 S.E. 2d 750 (1973); *State v. Finch*, 177 N.C. 599, 99 S.E. 409 (1919); *State v. Ataei-Kachuei*, 68 N.C. App. 209, 314 S.E. 2d 751 (1984).

While there is some evidence to the contrary, when viewed in the light most favorable to defendant, the evidence of defendant's state of intoxication is enough to require the voluntary intoxication instruction. Defendant had been seen drinking periodically from around 4 p.m. until 11 p.m. on the day of the murder. During that afternoon defendant appeared "high" while drinking more beer with another friend, and by early evening he was drinking a mixture of 190 proof grain alcohol and punch. Witnesses described defendant as "definitely drunk" and "pretty high" by 9:30 p.m. He swerved while driving his automobile to obtain more beer. After stopping at a package store parking lot to meet some friends, defendant left by himself for thirty or forty minutes. Upon returning, he appeared "changed all the way around" and "drunker, wilder and out of control." Defendant's eyes were dilated, his complexion had changed, he was sweating and had difficulty speaking or walking. Unprovoked, he inexplicably and viciously assaulted a girlfriend and several strangers. The fatal assault on Cupp was likewise unprovoked and, except for defendant's reference to Cupp's having guarded defendant's brother, inexplicable. The manner of the assault on Cupp and defendant's actions immediately before and after it were, themselves,

State v. Mash

equivocal on the question of whether defendant actually deliberated and premeditated his intent to kill Cupp. Certainly a jury could have found that he did. A jury could also have concluded, under proper instructions, that defendant was so impaired by alcohol that he formed no such intent but was simply thrashing wildly at anyone he perceived as a threat.

We note the district attorney, counsel for defendant, and the trial judge, who heard the evidence, all seemed to view it as sufficient to require the voluntary intoxication instruction. We agree with their assessment.

IV.

[3] The remaining question is whether the error in the instruction requires a new trial. The standards are found at N.C.G.S. § 15A-1443:

> (a) A defendant is prejudiced by errors relating to rights arising other than under the Constitution of the United States when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises. The burden of showing such prejudice under this subsection is upon the defendant. Prejudice also exists in any instance in which it is deemed to exist as a matter of law or error is deemed reversible per se.

> (b) A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless.

Although there is little question that defendant committed a homicide, the case is relatively close on the degree of his culpability. The closeness is due to both the substantial evidence of defendant's intoxication at the time he committed the crime and, as we have noted, the manner of the fatal assault and defendant's actions immediately before and after it. The central issue for the jury in light of the evidence adduced was whether defendant should be found guilty of first or second degree murder; and this issue hinged largely on how the jury would consider the evidence of defendant's intoxication. For these reasons, insofar as the error

committed is not one of constitutional dimension, defendant has met his burden of satisfying us that had the error in the instructions on intoxication not been made, there is a reasonable possibility that a different result would have obtained at trial. Insofar as the error is one of constitutional dimension, the state has not satisfied us beyond a reasonable doubt that the error was harmless.

Accordingly, defendant must be given a

New trial.