IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA20-179

Filed: 20 October 2020

Forsyth County, No. 18 CRS 052839

STATE OF NORTH CAROLINA

v.

STERLING JAMAR DILWORTH

Appeal by Defendant from Judgment entered 21 March 2019 by Judge L. Todd Burke in Forsyth County Superior Court. Heard in the Court of Appeals 8 September 2020.

Attorney General Joshua H. Stein, by Assistant Attorney General Thomas H. Moore, for the State.

Assistant Public Defender Brendan O'Donnell and Public Defender Jennifer Harjo for defendant-appellant.

HAMPSON, Judge.

**Factual and Procedural Background**

Sterling Jamar Dilworth (Defendant) appeals from a Judgment entered 21 March 2019 upon a jury verdict finding him guilty of Assault with a Deadly Weapon Inflicting Serious Injury. The Record before us, including evidence presented at trial, tends to show the following:

Travis Moses (Moses) and Ellsworth Jessup (Jessup) had been neighbors and had known each other since Moses was young. Moses owned an all-terrain vehicle

(ATV), and Jessup granted Moses permission to ride the ATV on Jessup's approximately thirty acres of property. Jessup cleared several trails throughout the property for Moses's use. Jessup's sister owned the parcel of property adjacent to Jessup's land, on which Defendant resided.

Around 8:10 p.m. on the evening of 29 March 2018, Moses was riding his ATV along Jessup's property. As he was riding his ATV, Moses stopped to send several text messages to a friend. Suddenly and without warning, an individual later identified as Defendant began attacking Moses with a steak knife. During the attack, Defendant repeatedly screamed "I don't know who you are." Defendant briefly paused his attack when Moses identified himself and informed Defendant that Jessup granted him permission to ride on the property. However, Defendant renewed his attack when Moses got off his ATV. After being stabbed multiple times, including in and around his neck and eye, Moses made his way back onto his ATV and drove it directly home, where his wife subsequently called 911.

Deputy A.J. Hatfield (Deputy Hatfield) of the Forsyth County Sheriff's Office responded to Moses's residence after dispatch reported a suspected stabbing. Deputy Hatfield found Moses in his garage with his wife, Jessup, and another man. Deputy Hatfield observed "a tremendous amount of blood spatter on the ground, surrounding [Moses's] body [and] also all over his body." Moses described the attack to Deputy Hatfield before being transported via ambulance to Wake Forest Baptist Hospital in

Winston Salem, North Carolina. Deputy Hatfield also spoke with Jessup, who gave him directions to Defendant's house since he was identified as the most likely suspect.

Investigator James Ray, also of the Forsyth County Sheriff's Office, met Moses at the Wake Forest Baptist Hospital Emergency Room. Moses again described the attack to Investigator Ray and provided him with the suspected location where there would likely be blood spatter and tracks from Moses's ATV. Investigator Ray testified through their conversation, Moses "was able to draw [him] a map of how he got on the land and provide a description of the most likely location of the crime scene." Moses then underwent surgery to repair damage to his eye caused by the stabbing. Before leaving the hospital to join the investigation, Investigator Ray called Deputy Hatfield to relay the suspected the location of the attack.

Investigator Ray arrived at Moses's residence soon after and assisted Deputy Hatfield in his search to determine where Moses was attacked. Investigator Ray and Deputy Hatfield located tire tracks and blood spatter on Jessup's property an estimated 200 to 250 feet from Defendant's trailer, which Investigator Ray testified was consistent with Moses's description. As Deputy Hatfield examined the ground and surrounding area, an individual, later identified as Defendant, approached Deputy Hatfield and Investigator Ray with his driver's license. Deputy Hatfield testified he asked Defendant if he knew why he was there, to which Defendant responded he had been in an altercation earlier.

Investigator Ray took over interviewing Defendant. Defendant told Investigator Ray he heard loud noises earlier that night and stepped outside to see what was going on. Then, Defendant continued, he heard music and saw Moses driving the ATV on his property. Defendant described approaching Moses from behind and stabbing him with the steak knife. During their conversation, Defendant identified to Investigator Ray the area of the attack, which Investigator Ray later confirmed with geodata to be outside Defendant's property line.[1] Investigator Ray asked Defendant where his property lines were but stated Defendant "wasn't able to identify exactly where his property lines were." Defendant accompanied Investigator Ray to the Forsyth County Sheriff's Office where Defendant provided a written statement.

On 2 July 2018, and again on 7 January 2019, Defendant was indicted for Assault with a Deadly Weapon with Intent to Kill Inflicting Serious Injury. On 10 May 2018, Defendant noticed his intent to put forth the affirmative defense of self-defense. Defendant's case came on for trial on 19 March 2019. At trial, Defendant testified in his defense. Defendant testified on the evening of 29 March 2018 he heard noises from the back of his house. Defendant went to his porch and saw an ATV "creeping alongside [his] house." Defendant described the ATV as traveling very slowly along a "little hill" in close proximity to his house. When defense counsel asked

---

[1] Investigator Ray testified the officers used geodata maps, which were obtained from public record websites and showed the parcels of land.

Defendant, "So, what, about 10 feet, 15?" Defendant answered: "Somewhere along those lines."

Defendant then recounted the attack, testifying he felt threatened for his safety. Defendant grabbed a steak knife from his cabinet, and, because the ATV had stopped, Defendant approached Moses screaming "I don't know you" and stabbing him repeatedly. Once Moses eventually identified himself and told Defendant he had permission from Jessup to ride on his property, Defendant testified he "backed off of him." However, when Moses got off of his ATV and took off his shirt, Defendant stated he again felt threatened and "that's when [he] really got to him. That's when it came to his eye and neck region, and things of that nature." Defendant reiterated his purpose in the attack was to get an intruder off his premises. On cross-examination, Defendant testified prior to the attack he smelled burning vegetation and heard gunshots. Defendant conceded, however, he did not mention either the smell of burning vegetation or gunshots to investigators the night of the attack or in his written statement. Defendant also corroborated Investigator Ray's testimony, stating: "Well, I mean, like I told the investigator, I'm not aware of the property line or nothing like that. I felt like all of that land there was -- belong to us."

During the charge conference, Defendant requested the trial court instruct the jury on the affirmative defenses of self-defense, according to North Carolina Pattern Jury Instructions 308.10 and 308.45, and defense of habitation, in accordance with

Pattern Jury Instruction 308.80. The trial court determined Defendant was not entitled to any instruction on self-defense or defense of habitation. In declining Defendant's requested instruction on defense of habitation, the trial court reasoned:

> [W]here the prosecuting witness is operating the all-terrain vehicle was not within the curtilage of the home. The home is not enclosed by a fence, and the -- additionally, as the Court previously said, the use of that property would not be such that it would be the immediate land or area to the home where there would be intimate living space.

The trial court also emphasized "[Defendant] has also testified he didn't even know where his property line was[.]"

The trial court instructed the jury on the charge of Assault with a Deadly Weapon with Intent to Kill Inflicting Serious Injury and, in accordance with Defendant's request, the lesser-included offenses of Assault with a Deadly Weapon with Intent to Kill and Assault with a Deadly Weapon Inflicting Serious Injury. The jury returned a verdict finding Defendant guilty of the lesser-included offense of Assault with a Deadly Weapon Inflicting Serious Injury. Defendant stipulated to a prior record level of V, and the trial court sentenced him to an active sentence of 44 to 65 months. Defendant gave oral Notice of Appeal at the conclusion of his sentencing.

## Issue

The sole issue on appeal is whether the trial court erred when it declined to instruct the jury on Defendant's requested instruction on the defense of habitation.

## Analysis

### I. Standard of Review

"It is the duty of the trial court to instruct the jury on all substantial features of a case raised by the evidence." *State v. Shaw*, 322 N.C. 797, 803, 370 S.E.2d 546, 549 (1988). "When determining whether the evidence is sufficient to entitle a defendant to jury instructions on a defense or mitigating factor, courts must consider the evidence in the light most favorable to defendant." *State v. Mash*, 323 N.C. 339, 348, 372 S.E.2d 532, 537 (1988) (citation omitted). Thus, "[w]here competent evidence of self-defense is presented at trial, the defendant is entitled to an instruction on this defense, as it is a substantial and essential feature of the case . . . ." *State v. Lee*, 370 N.C. 671, 674, 811 S.E.2d 563, 566 (2018) (citation and quotation marks omitted). We review challenges to the trial court's decisions regarding jury instructions de novo. *State v. Osorio*, 196 N.C. App. 458, 466, 675 S.E.2d 144, 149 (2009). "However, an error in jury instructions is prejudicial and requires a new trial only if there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." *State v. Castaneda*, 196 N.C. App. 109, 116, 674 S.E.2d 707, 712 (2009) (citation and quotation marks omitted).

### II. Defense of Habitation

In the present case, Defendant contends the trial court erred in denying his request for an instruction on defense of habitation because the evidence, taken in the light most favorable to Defendant, reflects he was asserting his right to defend his home against unlawful intrusion. North Carolina has long recognized this right— known at common law as the "castle doctrine." *See State v. Kuhns*, 260 N.C. App. 281, 284, 817 S.E.2d 828, 830 (2018). Most recently amended by our legislature in 2011, North Carolina's defense of habitation statute provides:

> (b) The lawful occupant of a home . . . is presumed to have held a reasonable fear of imminent death or serious bodily harm to himself or herself or another when using defensive force that is intended or likely to cause death or serious bodily harm to another if *both* of the following apply:
>
> (1) The person against whom the defensive force was used was in the process of unlawfully and forcefully entering, or had unlawfully and forcibly entered, a home, motor vehicle, or workplace, or if that person had removed or was attempting to remove another against that person's will from the home, motor vehicle, or workplace.
>
> (2) The person who uses defensive force knew or had reason to believe that an unlawful and forcible entry or unlawful and forcible act was occurring or had occurred.

N.C. Gen. Stat. § 14-51.2(b) (2019) (emphasis added); *see* An Act to Provide When a Person May Use Defensive Force and to Amend Various Laws Regarding the Right to Own, Possess, or Carry a Firearm in North Carolina, 2011 N.C. Sess. Laws 268, §1.

"Home" is defined "to include its curtilage," N.C. Gen. Stat. § 14-51.2(a)(1), and our courts have consistently defined curtilage to "include[ ] the yard around the dwelling and the area occupied by barns, cribs, and other outbuildings." *State v. Blue*, 356 N.C. 79, 86, 565 S.E.2d 133, 138 (2002) (citing *State v. Frizzelle*, 243 N.C. 49, 51, 89 S.E.2d 725, 726 (1955)). "[A] rebuttable presumption arises that the lawful occupant of a home, motor vehicle, or workplace reasonably fears imminent death or serious bodily harm when using deadly force at those locations under the circumstances in N.C. [Gen. Stat.] § 14-51.2(b)." *Lee*, 370 N.C. at 675, 811 S.E.2d at 566. Moreover, "a person does not have a duty to retreat, but may stand his [or her] ground." *Id.* (footnote omitted).

Defendant contends the evidence, construed in his favor, is sufficient to support such instruction because Defendant believed Moses to be unlawfully on his property at the time of the attack.[2] There is no question Defendant was the lawful occupant of his home. Nevertheless, to be entitled to the presumption articulated in Section 14-51.2(b), the statute expressly provides a defendant must meet *both* of the

[2] In support of his argument, Defendant cites this Court's decision in *Kuhns*, 260 N.C. App. at 283-85, 817 S.E.2d at 830-32, and our Supreme Court's recent decision in *State v. Coley*, ___ N.C. ___, ___, ___ S.E.2d ___, ___ (filed 14 Aug. 2020) (No. 2A19). However, in both *Coley* and *Kuhns*, there was no question at the time of the respective incidents the defendants used defensive force against another who was actually in their home or curtilage. *Coley*, ___ N.C. at ___, ___ S.E.2d at ___ (slip op. at 2-3) (describing three separate entries into the defendant's home prior to the defendant's use of force); *Kuhns*, 260 N.C. App. at 287, 817 S.E.2d at 832 ("[T]he State conced[ed] that [decedent] was 'standing beside the porch on the ground, *within the curtilage*' of defendant's property when defendant fired the fatal shot." (emphasis added)). Thus, we conclude both cases are factually distinguishable and do not control our analysis.

requirements set out in Subsections (1) and (2). N.C. Gen. Stat. § 14-51.2(b). Subsection 1 then mandates "[t]he person against whom the defensive force was used was in the process of unlawfully and forcefully entering, or had unlawfully and forcibly entered, a home[.]" *Id.* § 14-51.2(b)(1). Accordingly, to qualify for the instruction on defense of habitation Moses must have been "in the process of unlawfully and forcefully entering," or "had unlawfully and forcefully entered" Defendant's home, which on the facts of the present case would be via the curtilage. *Id.*

The question is, therefore, if there is sufficient evidence, construed in Defendant's favor, supporting Defendant's contention Moses was unlawfully on or had been on Defendant's property and was within the curtilage of Defendant's property on the evening of the attack to warrant the defense of habitation instruction. We conclude, as did the trial court, there is not. Defendant testified in his defense that on the night of 29 October 2018, he saw Moses "creeping along this little hill going very slowly" in "very close proximity of [his] household." Defense counsel inquired, "So, what, about 10 feet, 15?" and Defendant answered, "Somewhere along those lines." On cross-examination, however, Defendant emphasized: "I mean, like I told the investigator, I'm not aware of the property line or nothing like that. I felt like all of that land there was -- belong to us."

Defendant presented no actual evidence Moses was in the process of or had actually unlawfully and forcibly entered his home. Instead, the Record and evidence in this case reflects when Moses stopped on his ATV, he was outside the bounds of Defendant's property and around 200-250 feet away from Defendant's residence. Specifically: Investigator Rector and Deputy Hatfield both testified to the location of the blood spatter and ATV track marks on Jessup's property. Moses's own testimony stated he was riding his ATV along Jessup's property when Defendant attacked, and Moses's description of the attack was corroborated by Investigator Ray and, further, actually assisted the investigators in locating the blood spatter and ATV tracks. Investigator Rector also testified to his conversation with Defendant on the night of 28 March 2018, where Defendant informed him the attack occurred behind his parked cars, and two to three feet beyond some bushes, which was also outside the bounds of Defendant's property. Furthermore, the extent of Defendant's own testimony was that he "*felt like*" Defendant was on his property, but that he did not know the location of his property lines.

Thus, even if the evidence could support a determination Moses "had reason to believe that an unlawful and forcible entry or unlawful and forcible act was occurring or had occurred" under Section 14-51.2(b)(2), there is simply no evidence Moses was in fact "in the process of unlawfully and forcefully entering, or had unlawfully and forcefully entered, a home[.]" N.C. Gen. Stat. § 14-51.2(b)(1). Therefore, the trial

court did not err in declining to instruct the jury on Defendant's requested instruction of defense of habitation. Because we conclude the trial court did not err, we do not reach Defendant's argument he was prejudiced by the denial of an instruction on defense of habitation.

## **Conclusion**

Accordingly, for the foregoing reasons, we conclude there was no error in Defendant's trial.

NO ERROR.

Chief Judge McGEE and Judge DIETZ concur.