IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-95

No. COA21-151

Filed 15 February 2022

Richmond County, Nos. 15 CRS 50325-26, 1580

STATE OF NORTH CAROLINA

v.

MITCHELL GREEN

Appeal by Defendant from Judgments entered 7 February 2020 by Judge Stephan R. Futrell in Richmond County Superior Court. Heard in the Court of Appeals 30 November 2021.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Robert C. Montgomery, for the State.*

*Jarvis John Edgerton, IV, for defendant-appellant.*

HAMPSON, Judge.

**Factual and Procedural Background**

¶ 1      Mitchell Green (Defendant) appeals from Judgments entered upon jury verdicts finding Defendant guilty of one count each of Assault with a Deadly Weapon with Intent to Kill (AWDWIK), Attempted First-Degree Murder, and First-Degree Murder. The Record, including evidence adduced at trial, reflects the following:

¶ 2         On the evening of 6 February 2015, Defendant and Terry Smith (Smith) went to Christopher Goodwin's (Goodwin) home and began drinking alcohol. Both Defendant and Smith drank "liquor" and beer to the point both were drunk at Goodwin's home. While at Goodwin's home, Defendant brandished a firearm in front of Goodwin's minor daughter. Smith and Goodwin admonished Defendant for this behavior and, eventually, the parties made peace and continued drinking. After drinking at Goodwin's for two to three hours, Defendant and Smith left to go drink at a bar.

¶ 3         At the bar, Defendant and Smith met Tyrone Plair (Plair). Plair, Smith, and Defendant began drinking alcohol together. At some point, Defendant gave Plair money to buy a drink, but when Plair returned, Plair could not find Defendant and Smith. Plair eventually went outside the front of the bar and saw Defendant and Smith across the street. Plair went across the street to where Defendant and Smith were. Defendant and Smith were facing each other next to a car, and Plair ended up "at the back of the car" while Defendant and Smith were at the front of the car. Plair was behind Smith, and Defendant was facing Smith and Plair. Plair "was on [his] phone" but heard Defendant ask Smith why Smith took Defendant's car. Smith replied that he wanted to see his family. Plair heard Smith challenge Defendant before hearing gunshots. Plair fled when he heard the shots. Plair looked back after fleeing and saw Defendant get into a car and leave. As Plair walked home after the

incident, he noticed he had been shot in the leg. Smith died at the scene as a result of multiple gunshot wounds. Sometime during the evening, Goodwin recalled waking up to find Defendant in Defendant's car in Goodwin's driveway honking the horn for "about 30 minutes."

¶ 4    At approximately 1:17 a.m. on 7 February 2015, officers from the Hamlet Police Department responded to an alarm regarding shots being fired at a bar named Sports Connection. Sometime after the incident—as it was "still dark outside"— investigating officers received information they should go to a specific residential address in Hoffman, North Carolina, in connection with the incident. This address was Defendant's grandmother's address. While there, Defendant's brother gave officers a black and silver .40-caliber Springfield handgun. Eventually, officers from the State Bureau of Investigation (SBI) arrested Defendant and took him to the Rockingham Police Department. On the way, Defendant told officers "it was self-defense" and that Smith "had taken [Defendant's] car." Defendant further stated: "He come at me; he got what he got." On 16 February 2015, a Richmond County Grand Jury indicted Defendant on one count each of AWDWIK and Attempted First-Degree Murder for shooting Plair, and First-Degree Murder for shooting and killing Smith. Defendant's charges came on for trial on 21 January 2020 in Richmond County Superior Court.

At trial, the State's first witness was Richard Dunn, Sr. (Dunn, Sr.). Dunn, Sr. was the owner of a pawn shop in Rockingham and Dunn, Sr. contacted police because he heard about the shooting and "knew we had transferred the gun." Richard Dunn, Jr. (Dunn, Jr.) also testified. Dunn, Jr. worked in his father's pawn shop and testified that Defendant and Defendant's brother were in the pawn shop two days before the incident to transfer a handgun from Defendant's brother to Defendant. Dunn, Jr. testified to paperwork he filled out with Defendant and Defendant's brother transferring a "Springfield XD-M .40-caliber pistol" with a serial number "MG140V78." The State showed the handgun to the witness "for identification purposes," and Dunn, Jr. identified the handgun as having serial number "MG140278."[1] The State moved to admit the handgun to show that the serial number on the handgun given to police matched the serial number on the paperwork. Defendant objected, and the parties argued the matter outside the jury's presence.

Defense counsel argued:

> At this point what showing has been made that this is relevant to the charge of first-degree murder? There's no showing this was the weapon that was -- that was used in the shooting. All we know right now is Mr. Green bought a gun and the serial number on the gun that's on the -- on the sheet is the same that the gun that the State currently has in their possession. There's been no showing that this was the weapon that was used or is related to the shooting.

---

[1] The trial transcript reflects a small discrepancy between the serial numbers.

The State replied:

> Your Honor, he's charged with first-degree murder for shooting
> somebody. So we're presenting a gun that we have established he
> bought two days before the alleged murder. So it's been identified
> by the witness as the gun that he got on that date. That's why we
> are showing it and why it's relevant.

The trial court asked the State: "All right. And will you be offering evidence after this witness connecting up this gun with the charges at issue?" The State replied: "Yes, Your Honor, a number of witnesses." The trial court ruled: "All right. Subject to that corroboration, I will overrule the objection and will allow the presentation when we return." Defense counsel stated: "For the record, may we still contend that there is -- there has been no chain of custody established with respect to this gun and this shooting or how it's related to the shooting at all at this stage of the trial."

¶ 7        Before testimony resumed, defense counsel again argued the handgun should not be admitted without the State establishing the handgun's relevance and chain of custody. The State argued:

> Your Honor, the State would argue that the defense is
> misinterpreting "incident" here. The incident is not referring to
> that the State has to show it's tied to the killing. It's the incident
> that we're trying to show where it came from. We have played
> video of the gun being transferred to the defendant. That's the
> incident that we are trying to show the gun and, in fact, the same
> object involved with.

The trial court stated it would reserve its ruling until the end of Dunn, Jr.'s testimony. When the State asked if it would have to move to admit the handgun

again when asking further questions, the trial court responded: "It's already been admitted so . . . It's already been shown to the jury. And it's limited -- it's been admitted for the limited purpose of showing that it's the gun that was purchased, is my understanding." The State then showed the handgun with its serial number to the jury. The trial court did not give the jury instructions limiting the admission of the handgun for any particular purpose.

¶ 8    The State elicited testimony from Special Agent Russell Holly (Special Agent Holly), an SBI crime scene investigator. Special Agent Holly stated on 7 February 2015, he collected fifteen Smith and Wesson .40-caliber shell casings from the ground near Smith's body. He also processed Defendant's car as evidence. Holly also collected six projectiles from underneath Smith and in Smith's clothing. Testing from the SBI crime lab showed the shell casings had been fired from the handgun in question. Holly also found possible blood on Defendant's car. There was also evidence of blood on the handgun. Testing of swabs from the handgun and Defendant's car returned positive indications for blood. DNA testing of the blood indicated the blood matched Smith's DNA and not Defendant's. Toxicology results from Smith's autopsy showed Smith had a blood alcohol concentration (BAC) of "0.22 percent."

¶ 9    During the charge conference, the trial court indicated it would instruct the jury on "[v]oluntary intoxication, lack of mental capacity, premeditated and deliberate first-degree murder." The State argued it did not think that instruction

was "appropriate based on the case law." Defense counsel argued there was evidence of Defendant's intoxication where Defendant had been drinking for hours, consumed a lot of alcohol, Smith's BAC was 0.22, and Plair testified Defendant was "drunk" before the incident. Moreover, defense counsel argued evidence showing Defendant displayed a gun at Goodwin's residence in front of a minor child supported the inference Defendant was intoxicated to a degree such that "it caused the defendant to lose control of his senses sufficient that he could not form the intent to commit the crimes." The trial court ruled, "I'm not going to give that instruction," and Defendant objected to the ruling.

¶ 10 The jury found Defendant guilty of AWDWIK, First-Degree Murder, and Attempted First-Degree Murder. On 7 February 2020, the trial court entered Judgments sentencing Defendant to sixty to ninety months for the AWDWIK charge, life imprisonment for the First-Degree Murder charge, and 140 to 180 months imprisonment, to run consecutively to the life imprisonment sentence, for the Attempted First-Degree Murder charge. Defendant gave oral Notice of Appeal in open court.

## **Issues**

¶ 11 The issues on appeal are whether the trial court erred in: (I) failing to instruct the jury on Defendant's voluntary intoxication, possibly negating the specific intent

element of First-Degree Murder; and (II) admitting the handgun into evidence before

the State had established the handgun's relevance and chain of custody.

## Analysis

### I. Voluntary Intoxication Instruction

First, Defendant argues the trial court erred in denying his request the trial

court instruct the jury on voluntary intoxication because the evidence supported such

an instruction. We review whether a defendant was entitled to a jury instruction on

voluntary intoxication de novo to determine whether the evidence supported such an

instruction when considered in the light most favorable to the defendant. *State v.*

*Mercer*, 373 N.C. 459, 462, 838 S.E.2d 359, 362 (2020) (citations omitted). "In certain

instances voluntary drunkenness, while not an excuse for a criminal act, may be

sufficient to negate the requisite intent element. However, [n]o inference of the

absence of deliberation and premeditation arises from intoxication, as a matter of

law." *State v. Mash*, 323 N.C. 339, 347, 372 S.E.2d 532, 537 (1988) (citations and

quotation marks omitted).

> A defendant who wishes to raise an issue for the jury as to
> whether he was so intoxicated by the voluntary consumption of
> alcohol that he did not form a deliberate and premeditated intent
> to kill has the burden of producing evidence, or relying on
> evidence produced by the state, of his intoxication. Evidence of
> mere intoxication, however, is not enough to meet defendant's
> burden of production. He must produce substantial evidence
> which would support a conclusion by the judge that he was so

intoxicated that he could not form a deliberate and premeditated intent to kill.

*Id.* at 346, 372 S.E.2d at 536. "The evidence must show that at the time of the [crime] the defendants mind and reason were so completely intoxicated and overthrown as to render [her] utterly incapable of forming [specific intent]." *State v. Meader*, 377 N.C. 157, 2021-NCSC-37, ¶ 17 (alterations in original) (quoting *Mash*, 323 N.C. at 346, 372 S.E.2d at 536). Absent such evidence, a trial court is not required to instruct the jury on voluntary intoxication. *Id.*

¶ 13 Defendant argues he was entitled to a jury instruction on voluntary intoxication because the evidence, taken in the light most favorable to Defendant, showed Defendant had been drinking alcohol for over six hours, acted recklessly in displaying a gun in front of a child before the incident, and went to Goodwin's house and honked the horn of his car for thirty minutes after the incident. Thus, Defendant argues there was substantial evidence supporting the conclusion he could not form a deliberate and premeditated intent to kill Smith. For the following reasons, we disagree.

¶ 14 First, although the Record indicates Defendant and Smith had been drinking for hours before the incident in question, evidence of mere intoxication is insufficient to require a jury instruction on voluntary intoxication. We analyze whether a defendant was unable to form the intent to kill because of the defendant's intoxication

based on the defendant's actions leading up to the incident. *Mash*, 323 N.C. at 346, 372 S.E.2d at 536. *State v. Mash* is particularly instructive here. In *Mash*, the defendant was charged with first-degree murder stemming from the defendant assaulting several people. *Id.* at 342, 372 S.E.2d at 534. The defendant had been drinking alcohol for at least seven hours and "swerved" his car while driving to buy more alcohol. *Id.* at 340-41, 372 S.E.2d at 533-34. The defendant was "sweating" and had difficulty speaking and walking. *Id.* at 341, 372 S.E.2d at 534. Shortly before the defendant killed the victim, the defendant struck one of his friends in the mouth and struck two more friends while the group was at a liquor store. *Id.* at 341-42, 372 S.E.2d at 534. The victim, who lived near the liquor store, came from his home to help subdue the defendant. *Id.* at 342, 372 S.E.2d at 534. The defendant went to the trunk of his car and retrieved a "jack" and beat the victim to death with it. *Id.* When one of the defendant's friends screamed for the defendant to stop, the defendant did and began to cry. *Id.* The Court held this evidence was substantial and sufficient to have required a voluntary intoxication instruction. *Id.* at 348, 372 S.E.2d at 538.

¶ 15    Here, although Defendant had been drinking for hours, and Smith's toxicology report showed a 0.22 BAC, there is not substantial evidence Defendant could not control himself or was so intoxicated he could not form the intent to kill Smith. Although there was testimony Defendant pulled out a firearm in front of Goodwin's child, the parties resolved that incident before Defendant and Smith left to go drink

at a bar. Moreover, unlike in *Mash*, the Record does not indicate Defendant engaged in inexplicable behavior just prior to shooting Smith. Plair testified Smith and Defendant argued before Defendant shot Smith, not that Defendant began shooting indiscriminately or inexplicably assaulting people.

¶ 16     After the incident, unlike the defendant in *Mash*, Defendant had the wherewithal to flee the scene in his car and make it back to Goodwin's house without getting into an accident. Although there was evidence, after Defendant returned to Goodwin's home, Defendant sat in his car for thirty minutes honking his horn, this evidence is not substantial evidence Defendant was intoxicated as to be unable to form a deliberate and premeditated intent to kill at the time of the shooting. Indeed, undermining Defendant's invocation of the voluntary intoxication instruction is evidence that Defendant gave an explanation as to why he had shot Smith. Defendant told police he shot Smith in self-defense and that "He come at me; he got what he got." Thus, the evidence tended to reflect Defendant appreciated the nature of his actions after the incident. Therefore, although there was evidence Defendant was very intoxicated and acted recklessly some hours before the incident in question, there was not substantial evidence Defendant was intoxicated to the point he could not control himself and could not form the intent—based on premeditation or deliberation—to kill Smith at the time of the shooting. Consequently, the trial court did not err in not instructing the jury as to Defendant's voluntary intoxication.

## II. Admitting the Handgun

Defendant next argues the trial court erred in admitting the handgun into evidence without the State first establishing the handgun's relevance to the case. "[T]he appropriate standard of review for a trial court's ruling on relevancy pursuant to Rule 401 is not as deferential as the abuse of discretion standard which applies to rulings made pursuant to Rule 403." *Dunn v. Custer*, 162 N.C. App. 259, 266, 591 S.E.2d 11, 17 (2004) (citation and quotation marks omitted). However, "such rulings are given great deference on appeal." *Id.* (citation and quotation marks omitted). Here, Defendant does not argue that the handgun was not relevant evidence; instead, he argues the trial court erred by admitting the handgun before the State had connected the handgun to the incident and before the State had established a chain of custody.

"Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b)." N.C. Gen. Stat. § 8C-1, Rule 104(a) (2021). "When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition." N.C. Gen. Stat. § 8C-1, Rule 104(b) (2021). "[A] two-pronged test must be satisfied before real evidence is properly received into evidence. The item offered must be identified as

being the same object involved in the incident and it must be shown that the object has undergone no material change." *State v. Campbell*, 311 N.C. 386, 388, 317 S.E.2d 391, 392 (1984) (citations omitted). However, a trial court may properly admit evidence "pending the admission of [other] evidence that would tie the [evidence] to" the case. *State v. Jordan*, 305 N.C. 274, 276, 287 S.E.2d 827, 829 (1982) (citations omitted).

¶ 19    The State moved to admit the handgun during Dunn, Jr.'s testimony regarding Defendant transferring the handgun into Defendant's name at Dunn's pawn shop. Dunn, Jr. testified the paperwork he helped Defendant fill out listed the serial number for the handgun as "MG140V78." Later, the State moved to introduce the handgun to show that the serial number on the handgun given to police matched the serial number on the paperwork. At this early stage of the State's case in chief, the State had yet to present any evidence the gun was used in the shooting. The State showed the handgun to Dunn, Jr., and he identified the serial number on the handgun as "MG140278." Defense counsel objected to the admission of the handgun. Outside the jury's presence, defense counsel argued, "[t]here's no showing this was the weapon that was – that was used in the shooting." The trial court asked the State: "All right. And will you be offering any evidence after this witness connecting up this gun with the charges at issue?" The State responded: "Yes, Your Honor, a number of witnesses." The trial court then ruled: "All right. Subject to that corroboration, I

will overrule the objection and allow the presentation [of the handgun] when we return." Defense counsel stated Defendant would likely still challenge the chain of custody regarding the handgun at a later point. When the jury returned, the State showed the handgun with its serial number to the jury over Defendant's objection.

¶ 20    Even if the trial court should have required the State to establish the handgun's relevance to the charges in this case prior to admitting the handgun into evidence, the trial court did not err in admitting the handgun because the State presented later evidence connecting the handgun to the case. *Jordan*, 305 N.C. at 276, 287 S.E.2d at 829. The State presented evidence police recovered the handgun from Defendant's brother at Defendant's grandmother's house, fifteen shell casings found at the scene were fired from the handgun, and DNA from blood found on the handgun matched Smith's DNA. Thus, the State presented evidence connecting the handgun to the charges in this case after the handgun had been admitted into evidence by the trial court. Therefore, the trial court did not err in admitting the handgun before its relevance had been established.[2]

---

[2] Defendant also argues the trial court confused the issue by later stating the handgun had been admitted for the limited purpose of showing it had been the subject of the transfer at the Dunn's pawn shop and, because the handgun was never again admitted into evidence for any other purpose, it was never properly admitted to show it was the handgun used in this shooting, and the trial court initially stated it was allowing the handgun subject to later evidence connecting the handgun to the case. Because the State later presented the evidence connecting the handgun to the case, the State established the handgun's relevance.

¶ 21        However, at trial, Defendant stated he would likely challenge the handgun's chain of custody if and when it was later admitted into evidence. The State never presented the handgun again when it presented evidence of police investigation connecting the handgun to the case. Thus, although the State presented evidence linking the handgun to the case, it may not have satisfied the second requirement it establish chain of custody before admitting the handgun. However, Defendant never actually, subsequently objected on this ground, and, thus, appears to have waived any such objection. N.C.R. App. P. 10(a)(1) (2021). Nevertheless, even assuming the issue was preserved for appeal, and the trial court erred in admitting the handgun without the State ever establishing a chain of custody, such error did not prejudice Defendant in light of the other evidence.

¶ 22        "A defendant is prejudiced by errors . . . when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached . . . ." N.C. Gen. Stat. § 15A-1443(a) (2021). However, "the presence of [other] overwhelming evidence of guilt can render the erroneous admission of evidence harmless." *State v. McCanless*, 234 N.C. App. 260, 262, 758 S.E.2d 474, 477 (2014) (alteration in original) (citation and quotation marks omitted). Here, the State presented evidence Plair heard Defendant and Smith argue, heard gunshots and ran, and saw Defendant drive away from the scene. The State also presented evidence police recovered a handgun from Defendant's brother, shell casings fired from that

gun were found at the scene, and Smith's blood was on the handgun. Moreover, the State presented testimony Defendant told police that "it was self-defense" and "He come at me; he got what he got." Thus, in light of such overwhelming evidence of Defendant's guilt, there was no reasonable possibility the jury would have reached different verdicts absent the handgun's admission. Therefore, the trial court did not commit reversible error by admitting the handgun.

## **Conclusion**

Accordingly, for the foregoing reasons, the trial court did not err in refusing to instruct the jury on Defendant's voluntary intoxication and did not commit prejudicial error in admitting the handgun into evidence, and we affirm the Judgments.

NO PREJUDICIAL ERROR.

Chief Judge STROUD and Judge GORE concur.